OPINION OF THE COURT
Thomas J. Lowery, J.
The claimant, David Tabone, seeks to recover damages for personal injuries sustained on July 14, 1976, when he *865 was severely burned during a training exercise at the Genesee County Fire Training Center in Batavia, New York.[1] Liability is predicated on the State’s negligence in providing claimant with an appliance that was unsafe for its intended use.
FACTUAL BACKGROUND
At the time of the accident, the claimant was employed, as a fireman[2] by the City of Batavia and was enrolled in a class known as “Essentials , of Firemanship”. The class, which was planned, directed, supervised and instructed by an employee of the State of New York, was provided without cost to the participants and was available to the County of Genesee upon the request of its fire co-ordinator. The State furnished workbooks and lesson plans. The county furnished an instruction building, a smoke house for training drills, and certain classroom-related equipment. Keith Hunt, a certified State instructor, had been assigned to teach the class.
The lesson scheduled for the night of the accident included a smoke drill that was intended to train the students in the use of air packs. Such an exercise was to be conducted in the smoke house, a structure separate from the instruction building. Previously, smoke had been produced by burning wet straw or rags, a method that had proved unsatisfactory. For this drill, a device thought to be a smoke bomb was employed. In reality, it was a white phosphorus antipersonnel grenade commonly used by the military.
For some time prior to the subject accident, Wilbur Hinz, Genesee County Fire Co-ordinator, had conducted a search for an alternate way to create smoke for such exercise. He had discussed the problem with a number of people, including Robert Hulshoff, a correction officer at Attica Correctional Facility. The latter advised Hinz that he had a smoke-making device that he would be willing to give him. *866 Thereafter, Hulshoff delivered to Hinz a sealed gray cylindrical cannister marked with a yellow stripe and yellow letters reading:
“grenade hand
“smoke wp, m15
“wp
“smoke”
Hinz, who admitted that he had some familiarity with both smoke and metal or bursting grenades, denied that he had any previous experience with the white phosphorus type. He accepted the cannister, relying solely on Hulshoff s representation that it contained a smoke bomb, and took it to his office at the training facility. There it remained for several months. At no time did Hinz open the cannister to confirm that it was a smoke bomb. Such inquiry was warranted when considering the appearance of the sealed cannister and the fact that it had not been obtained through the usual and customary channels.
Two days before the accident, Hinz telephoned Keith Hunt, the State instructor. He told Hunt that he had a smoke bomb available for the lesson and that he would leave it on his desk at the training facility. Prior to the start of the class that evening, Hunt proceeded to Hinz’ office, removed the sealed cannister, and took it to the classroom.
Hunt had previous experience with the flare-type smoke device, but was not personally familiar with the grenade type or the manner in which the latter was packaged. This was evidenced by an inquiry he made at the beginning of the class, when he picked up the sealed cannister and asked the students if any of them knew what “wp smoke” or “m15” meant, to which he received no reply. Notwithstanding the fact that his suspicions were aroused, he never opened the sealed cannister. Had he done so, he would have discovered that the object inside, clearly marked “bursting type”, was a white phosphorus antipersonnel grenade and not a smoke bomb. In sum, Hunt was totally unaware of the contents of the sealed cannister. Despite his lack of knowledge, he represented to the class that it contained a smoke bomb to be used in the drill.
*867 The claimant, who was not present for the class instruction, arrived at the training center at approximately 8:45 p.m. At that time, preparations were being made for the smoke drill. The claimant asked what was to be used to produce smoke. Hunt replied that he had a smoke grenade, pointing to the sealed cannister at the opposite end of the classroom.
Shortly thereafter, the students gathered their equipment, left the instruction building, and proceeded to the smoke house for the drill. It was dark at the time and the only source of light was a pair of portable 500 watt lamps that were temporarily set "up on sawhorses in the yard. This was sufficient to allow the participants in the drill to move about safely, but was clearly inadequate for reading purposes.
The claimant, who was assisting. Hunt, carried a mannequin from the classroom and placed it in the smoke house to be “rescued” in the drill. Since it was not his intention to participate in the actual drill, he wore no protective gear. Immediately following the placement of the mannequin, the claimant came into possession of the grenade. It was never established who had carried it from the classroom to the yard or who had removed it from the sealed cannister. Nor was it established that the claimant knew the true nature of the device. Holding the grenade in his hand, the claimant approached Hunt, who told him to go ahead and use it. He walked over to the smoke house, pulled the pin, and detonated the grenade. It exploded in his hand, showering him with white phosphorus and setting him on fire.
LIABILITY
At trial, the claimant sought to have introduced as an admission against the State’s interest certain portions of a memorandum[3] that related to the subject accident. The memorandum, which was prepared by the State Director of Fire Prevention and Control and directed to his superior, the Secretary of State, drew conclusions as to the State’s share of culpability based on information[4] gathered by individuals who had investigated the accident. Such evi *868 dence must be rejected,[5] for there was no proof that the writer of the memorandum had either the requisite authority to make a report as to who was responsible for the accident, or that he was delegated the responsibility to do so, or that the writer’s report was ever adopted by the State. (See Cox v State of New York, 3 NY2d 693; Reed v McCord, 160 NY 330; Georges v American Export Lines, 77 AD2d 26; Richardson, Evidence [10th ed], §§ 214, 238, 252, 253.) Moreover, the conclusion stated with respect to the State’s culpability concerns a matter that is within the province of the trier of the facts to determine and should be excluded. (Bothner v Keegan, 275 App Div 470; Fisch, Evidence [2d ed], § 959.)
Turning now to the issue of the State’s liability, it is well settled that in an instructor/pupil relationship, such as existed here, where it can be said that the pupil’s interests are entitled to legal protection against the instructor’s conduct (see Pulka v Edelman, 40 NY2d 781, 782; Prosser, Torts [4th ed], § 53, p 325), a duty is imposed upon the instructor to exercise reasonable care to avoid injuries. (Clark v Board of Educ., 304 NY 488; Govel v Board of Educ., 267 App Div 621, affd 293 NY 928; Gardner v State of New York, 256 App Div 385, affd 281 NY 212; Segel v State of New York, 79 Misc 2d 529.) Where the instructor undertakes to furnish appliances or equipment for the class, such standard of care requires that the equipment be reasonably safe for its intended use. (Gross v Sweet, 49 NY2d 102.) Where it is not, and injury results, liability will be found. (Bridges v Board of Educ., 301 NY 631; Rivera v Board of Educ., 11 AD2d 7; Restatement, Torts 2d, § 307.)
In the present case, there is no question that the grenade furnished by Hunt, the State instructor, was highly inappropriate for use as a smoke-making device and, as such, presented a foreseeable risk of injury. The next question presented is whether Hunt was under an affirmative duty to open the sealed cannister to make certain that it contained a smoke bomb, or whether he was entitled to rely solely on the representation of Hinz, the county fire co *869 ordinator. Given the circumstances presented here, the court finds that further investigation was reasonably required. (See Restatement, Torts 2d, § 289.) Hunt’s failure to do so constituted negligence and such was a substantial factor in bringing about the claimant’s injuries.
Aside from resting the State’s liability on traditional negligence concepts, the State’s liability may also be grounded in negligent misrepresentation. (See White v Guarente, 43 NY2d 356; International Prods. Co. v Erie. R.R. Co., 244 NY 331; Glanzer v Shepard, 233 NY 236; 6B Warren’s Negligence, ch 17, § 3, p 501.) Hunt had no actual knowledge of the contents of the cannister. Despite this lack of knowledge, he represented to the class that it contained a smoke bomb, thereby enhancing the risk of injury, since it was reasonably foreseeable that the pupils would rely and act upon this statement to their detriment. Such was the case here.
Finally, the issue of whether the conduct of the claimant contributed to the accident must be resolved. In this regard, the State had the burden of proof (CPLR1412), which was not met. The claimant had a right to rely on Hunt’s representation that the device was a smoke bomb unless he knew or should have known otherwise. This was not established, since the only evidence of his possession of the device was in a darkened area outside the training facility. In addition, the claimant’s failure to throw the grenade cannot be assigned as a cause, for he was acting under the reasonable belief that it was a smoke bomb and, hence, was harmless. Lastly, the claimant’s failure to wear protective clothing cannot be considered a contributing factor, for there was no proof that had he done so, his injuries would have been any less severe.
Accordingly, the court finds the State to be solely liable for the accident and the injuries and damages resulting to the claimant therefrom.
DAMAGES
At the time of the accident, the claimant was 24 years of age. At trial, he was 29.[6] He was married, but subsequently *870 divorced and there is no derivative claim before the court. He had been a fireman since January, 1974 and at the time of the accident, was earning $224.25 per week. He also worked for the City of Batavia Water Department as a meter reader. For the six-month period prior to the accident he had earned $345.62.[7] He had earned a high school diploma in 1970 and an associate’s degree in surveying from Alfred State College in 1972. He participated in basketball, baseball, bowling, and was a certified basketball referee. He also liked to hunt. Prior to the accident, he was a strapping, handsome lad, who thoroughly enjoyed his family and his work.
Following the accident, he was taken to St. Jerome’s Hospital in Batavia, where he was given last rites and then transferred the same night to the burn treatment center at Sheehan Memorial Emergency Hospital in Buffalo, New York. He remained there for the next 72 days. When first presented at the treatment center, the claimant was in critical condition with second and third degree burns over 35% of his body, including his face, neck, chest, arms, hands, and upper thighs. His appearance was grotesque, since his facial features had been all but obliterated by the force of the blast. He was in extreme pain and was unable to open his eyes or his mouth. He also suffered from massive edema, shock, and circumferential constriction of both wrists, the latter requiring immediate surgical release to allow circulation to his hands. His right middle finger had been amputated in the blast. Within 24 hours, he developed acute respiratory distress, which later necessitated a tracheostomy and continuous use of an artificial respirator. For a period of approximately four weeks he was confined to his bed, where he developed thrombophlebitis of the left leg.
Throughout his hospital confinement, the claimant was given anticoagulants to treat the thrombophlebitis. Artificial tears were supplied to replace the natural function of the claimant’s eyelids, which had been burned off in the explosion. His eyes became infected and antibiotics were administered. He was given diuretics for his kidneys, digi *871 talis to support his heart, tranquilizers and Demerol to control the constant excruciating pain. He underwent daily psysiotherapy to increase his mobility, and was immersed in a tank several times each day for the purpose of debriding dead skin in the burned areas. The latter procedure exacerbated his discomfort. The burned areas became infected and required antibiotics, which were administered throughout the course of his hospitalization.
Skin grafting was first performed on August 19, 1976 to areas of the claimant’s face, neck, chest, and both arms and hands. On September 3, 1976, skin was grafted to his hands and half of his left index finger was amputated. Between October 11,1976 and April 20,1981, the claimant was hospitalized at Buffalo General Hospital 18 additional times for various surgical procedures, including skin grafts, reconstruction of the lips, mouth, nose, earlobes, and lower eyelids, grafting of the hair-bearing skin to create eyebrows, release of multiple skin contractures, removal of scar and dysfunctional tissue, and finger amputations.
For a period of one and one-half years after his discharge from Sheehan on September 24, 1979, the claimant was unable to use his hands and had to be fed, dressed, bathed, and assisted in his eliminatory functions by others. He was also dependent upon his parents to change his dressings several times daily. During that time he had to wear a neck brace and hand splints, as well as special therapeutic burn garments. He traveled back and forth to Buffalo General Hospital approximately three times each week for physical therapy sessions.
The claimant has sustained the following permanent injuries: loss of the little finger and tip of the second finger on the right hand; loss of the first finger and tip of the second finger on the left hand; fused thumb joints on each hand; massive scars on his face, neck, chest, arms and hands, and loss of hair in both temporal areas and on the face. The injuries to his hands have resulted in a two-thirds loss of function in each hand. His ability to move his neck has been limited by the presence of scar tissue. There is a loss of skin pigmentation and sensitivity in the grafted skin areas. In addition, his eyes water excessively and his *872 grafted skin is tight and dry and chaps easily. He is unable to tolerate temperature extremes or sunlight. His earlobes suffer from chronic inflammation and his hands are often sore and aching.
As a result of the claimant’s permanent and painful injuries, his quality of life has been substantially diminished. Although he returned to work on January 4, 1979, he is unable to participate in the sports activities that he once enjoyed. His physical appearance can be likened to that of a gnome and is unlikely to be improved by future corrective surgery. He wears a v/ig and plain lens eyeglasses for cosmetic reasons.
In addition to seeking compensatory damages, the claimant seeks to recover the sum of $78,204.99 for hospital, medical and other related expenses,[8] together with sums claimed for lost earnings totaling $33,942.40.[9] The evidence amply supports such claims.
Accordingly, the court finds that the claimant, David Tabone, has been damaged in the sum of $2,112,147.39 ($2,000,000 compensatory damages; $112,147.39 special damages).
EFFECT OF CONSIDERATION PAID TO CLAIMANT BY RELEASED TORT-FEASOR
In the present case, counsel for the claimant introduced in evidence a release executed by the claimant in favor of Genesee County which provided for payment of the sum of $560,000 to the claimant. Whether the damages found to have been sustained by the claimant should be reduced by the amount of the settlement depends on a determination of the released tort-feasor’s (Genesee County) equitable share of those damages under CPLR article 14. (CPLR 4533-b; General Obligations Law, § 15-108.) If the latter is *873 determined to be greater than the amount paid in settlement, then the damages found will be reduced by the released tort-feasor’s equitable share. Otherwise, they will be reduced by the amount of the settlement. (General Obligations Law, § 15-108.)
In determining the relative culpabilities of the State and the released tort-feasor, the court finds that for the reasons stated herein, Hinz, the Genesee County Fire Co-ordinator, was not entitled to rely on the representation of Correction Officer Hulshoff, but had an affirmative duty to inspect the contents of the sealed cannister. His failure to do so constituted negligence. Moreover, when Hinz delivered the cannister to Hunt, it was foreseeable that an injury would result to a member of Hunt’s class. Hence, Hinz’ negligence, and that of Genesee County, was also a substantial factor in bringing about the accident and the injuries to the claimant.
The negligence of Hinz and that of Genesee County, however, played only a small part in the series of transactions leading to the happening of the accident. The force that caused the injury was under the direct control of Hunt. He could have brought it to rest, had he acted reasonably. Hence, weighing all of the facts and circumstances, the court finds the equitable share of culpability of Genesee County to be 25.% and of the State to be 75%. Applying the county’s share to the damages found, it is apparent that the amount of the settlement was greater than the county’s equitable share. Therefore, the damages found will be reduced accordingly.
AWARD
In accordance with the foregoing decision, the claimant, David Tabone, is awarded the sum of $1,552,147.39 for all damages sustained as a result of the accident of July 14, 1976.
MOTIONS
All motions made at the time of trial, not heretofore determined, are deemed denied.

. The claimant brought a separate action in State Supreme Court against Genesee County. This action was settled and a general release was executed by the claimant. The consideration for such release was the sum of $560,000.

. Since the claimant was not a volunteer fireman, the provisions of the Volunteer Firemen’s Benefit Law have no application and, hence, workers’ compensation is not deemed an exclusive remedy.

. Exhibit No. 24.

. Exhibits Nos. 16, 50, 52, 53.

. At this time, the State’s objections to Exhibits Nos. 16, 24, 50, 52 and 53, made at the time of trial and upon which decision was reserved, are now sustained.

. His life expectancy at the time of trial was 43.8 years. (See 1 NY PJI 2d 250 [Supp].)

. No claim is made for wages lost from this employment.

. Dr. Pauli, $16,132.15; Dr. Cloutier, $1,844.01; Buffalo Anesthesia Associates, $2,990.35; Sheehan Memorial Emergency Hospital, burn treatment center, $32,669.58, $181.25, $116.40; Dr. Greco, $39.60; Erie County Medical Center, $23.50; St. Jerome’s Hospital, $268.55; Dr. Naples, $243.89; University Radiologists, $82.03; Dr. Peimer, $6,877.40; Buffalo General Hospital, $15,119.01, $1,441.75; Dr. Culver, $146.52; Cardiologic Associates, $29.

. July 14,1976 through Jan. 4,1979 (128 weeks), $31,408; 1979: (3 weeks), $805.08; 1980: (3 weeks and 2 days), $1,052.68; 1981: (2 weeks), $676.64.