Harry **MARTELL**, Individually and as Parent and Natural Guardian of William Brent Martell, an infant, Plaintiff-Appellee,

v.

**BOARDWALK ENTERPRISES, INC.,** Nicholas F. Cutro, Individually and d/b/a Boardwalk and/or Lake George Boardwalk and/or Boardwalk on Lake George and/or Boardwalk Boat Rental, William Revy, the Village of Lake George, New York, Kawasaki Motors Corp., U.S.A., and WRD Enterprises, Inc., d/b/a Saratoga Kawasaki, Defendants,

Nicholas F. Cutro, Individually and d/b/a Boardwalk and/or Lake George Boardwalk and/or Boardwalk on Lake George, Boardwalk Boat Rental, William Revy, Kawasaki Motors Corp., U.S.A., Defendants-Appellants.

Nos. 1383 to 1386, Dockets 83–9028, 83–9064, 83–9066 and 84–7276.

United States Court of Appeals, Second Circuit.

Argued June 25, 1984.

Decided Nov. 13, 1984.

Kenneth G. Varley, Albany, N.Y. (Donohue, Donohue & Sabo, P.C., Albany, N.Y., on brief), for plaintiff-appellee.

Richard T. Horigan, Amsterdam, N.Y. (Horigan & Horigan, Amsterdam, N.Y., on brief), for defendant-appellant Nicholas F. Cutro, Etc.

Robert A. Murphy, Jr., Albany, N.Y. (Lyons, Pentak, Brown & Tobin, Albany, N.Y., on brief), for defendant-appellant William Revy.

Daniel A. Whalen, Albany, N.Y. (Hesson, Ford, Sherwood & Whalen, Albany, N.Y., on brief), for defendant-appellant Kawasaki Motors Corp., U.S.A.

Martin A. Meyer, Glen Falls, N.Y. (McPhillips, Fitzgerald, Meyer & McLeni-

than, Glen Falls, N.Y., on brief), for defendant The Village of Lake George, New York.

Before KEARSE, PIERCE and MARKEY,* Circuit Judges.

KEARSE, Circuit Judge:

Defendants Nicholas F. Cutro, individually and d/b/a *inter alia* Boardwalk ("Cutro"), William Revy, and Kawasaki Motors Corp., U.S.A. ("Kawasaki"), appeal from a judgment entered in the United States District Court for the Northern District of New York, Roger J. Miner, *Judge,* following a jury trial and verdict in favor of plaintiff Harry Martell ("Harry") suing in his own behalf and as parent and guardian of his son, William Brent Martell ("Brent"), requiring appellants to pay damages in the amount of $1,333,333.34 for Brent, plus $166,666.66 for Harry. On appeal, Kawasaki contends that the trial court erred in not granting it judgment notwithstanding the verdict or a new trial on account of errors in the determination of its liability; Cutro challenges pretrial, trial, and posttrial rulings affecting his liability; and all of the appellants argue that the damages determined by the jury for Brent and Harry were excessive. Although we reject the arguments of Kawasaki and Cutro as to liability, we agree that the jury's awards of damages were excessive, and we remand the case for a new trial as to damages unless plaintiff agrees to remit all sums in excess of $800,000 as to Brent and $40,000 as to Harry.

## I. BACKGROUND

### A. *The Accident*

There appears to be little dispute as to the events that led to the accident, which occurred on the afternoon of August 31, 1979, on Lake George in northern New York. Brent, a 16-year-old with sailing experience and some familiarity with the rules of watercraft navigation, rented a Jet Ski from Cutro, who was in the business of renting Jet Skis, boats, and other watercraft. A Jet Ski is a small, low profile, motorized vessel—seven feet long, two feet high, and two feet wide—designed with a narrow beam to enhance its maneuverability. It is designed to be driven at speeds of up to 35 m.p.h. with the operator in a standing or kneeling position; balance is required to operate it.

Brent had never operated a Jet Ski before the day of the accident. When he rented the Jet Ski from Cutro on August 31, Brent read all of the materials relating to the Jet Ski's operation available at the rental booth and received explanation from one of Cutro's employees as to Cutro's rules and the basic principles of the Jet Ski's operation. The Jet Ski in question had been manufactured by Kawasaki, which had sold it to WRD Enterprises, Inc., d/b/a Saratoga Kawasaki ("WRD Enterprises"), which in turn sold it to Cutro. Brent was not shown a copy of the Kawasaki operator's manual for the Jet Ski. Cutro had formulated his own warnings and precautions for his customers. Safety regulations were posted at Cutro's rental boat house stating, *inter alia,* that watercraft should not be operated within 200 feet of each other. Brent was given the same warning orally by Cutro's employees.

Brent had difficulty in learning to operate the Jet Ski. The boat traffic was heavy, causing waves and choppiness on the water, with some chops as much as two feet high. There was expert testimony that the Jet Ski did not handle well in rough or choppy water conditions. Brent fell off the Jet Ski between eight and twelve times and ultimately had to operate it from a kneeling position. He testified that, in order to keep his balance and avoid tipping the Jet Ski, he had to keep his shoulders square and that it was difficult to turn his head without losing his balance. There was also testimony that the small size and low profile of the Jet Ski tended to

---

* Honorable Howard T. Markey, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

hinder its visibility to other watercraft, and that the choppiness of the water on August 31 further tended to obscure the Jet Ski from view.

The other watercraft involved in the accident was a motorboat operated by Revy. Revy was an inexperienced motorboat operator; he had not been in a boat for about a year, and had had a total of just two hours of operating experience prior to the accident. He had rented the boat from Cutro and had received the same instruction given Brent as to the need to remain at least 200 feet from other vessels. While Revy operated the boat, two of his small children were seated in the front of the boat, between Revy and the windshield. The accident occurred after Revy had traveled between 600 and 800 yards from shore. Revy, who had looked to his left a few seconds before the collision and not seen the Jet Ski, was not aware of the presence of the Jet Ski until his daughter, a passenger in the boat, warned him of its approach to the left.

Revy's motorboat hit the rear of Brent's Jet Ski and severed the lower two-thirds of Brent's left arm. Brent also suffered fractures of the 4th and 5th ribs, a punctured lung, and multiple contusions.

## B. *The Proceedings Below*

This diversity action is a consolidation of the actions brought in 1980 and 1981 by Harry suing as parent of Brent for Brent's injuries and suing individually to recover for expenses caused by the accident and for the loss of his son's services. In addition to the appellants, the complaints named as defendants WRD Enterprises and the Village of Lake George (the "Village"). The complaints alleged, *inter alia,* that (a) Cutro had been negligent in renting the Jet Ski and the motorboat for use on the crowded and congested Lake George waters and in failing to give proper instruction to the operators on the use and operation of those crafts; (b) Revy had been negligent in the operation of the motorboat; (c) the Village had been negligent in failing to terminate, supervise, or control

Jet Ski rental and operation on Lake George; (d) Kawasaki had been negligent in the design of the Jet Ski, in improperly advertising the product, and in failing to warn operators and owners of the dangers in operation of the Jet Ski, particularly in areas with congested boat traffic; and (e) WRD Enterprises had made an improper sale of the Jet Ski to Cutro.

At trial, plaintiff presented the testimony of three experts as to alleged defects in the Jet Ski and its accompanying warnings. These experts testified, *inter alia,* that the Jet Ski was unstable and difficult to balance, that it was difficult for the skier to keep his balance if he turned his head, and that the Jet Ski's color and low profile interfered with its visibility. They also opined that the warning plate on the Jet Ski, which stated, "KNOW LIMITATIONS OF VEHICLE," was insufficient and that inadequate information and warnings had been provided about the instability and handling characteristics of the Jet Ski.

Kawasaki, on the other hand, called experts who testified that the visibility of a person operating a Jet Ski from a kneeling position is unrestricted; that a 16-year-old should be able to learn to ride a Jet Ski in a matter of minutes; and that the Jet Ski is a stable vehicle at moderate to high speeds. One of Kawasaki's experts opined that the warning label on the Jet Ski was adequate under the standards of the boating industry.

As set forth in greater detail in Part III below, plaintiff presented medical and psychiatric testimony as to Brent's injuries, his treatment, and his psychological problems in adjusting to the amputation of his arm. There was no evidence that future medical treatment would be needed and no estimates as to the cost or duration of any future psychological treatment that might be needed. No evidence was presented as to any loss of past earnings or anticipated impairment of future earnings.

The evidence presented on Harry's own claim included a list of medical and educational expenses incurred on behalf of Brent totalling $25,975.79. Brent's parents also

testified in support of Harry's claim for loss of Brent's services during Brent's minority, stating that Brent could no longer help with certain household chores.

Prior to the close of trial, the court directed a verdict in favor of the Village.[1] The claims against the remaining defendants were submitted to the jury on 18 written interrogatories, 15 directed to liability issues, one to apportionment of fault, and two to damages. The jury found that Cutro had not been negligent in renting the Jet Ski to Brent or the motorboat to Revy; that Revy had been negligent and that his negligence was a proximate cause of Brent's injury; that although Kawasaki had been negligent in the design of the Jet Ski, and the design defect existed when WRD Enterprises sold the Jet Ski to Cutro, the design defect was not a substantial cause of the accident; that Kawasaki had also been negligent in failing to warn of the dangers in Jet Ski operation and that this failure was a proximate cause of Brent's injuries; and that Brent had been contributorily negligent. The jury attributed 33⅓% of the fault for the accident each to Revy, Kawasaki, and Brent.

The jury found that the damages suffered by Brent and Harry, respectively, amounted to $2,000,000 and $250,000. Reducing these amounts by ⅓, the extent to which Brent was found contributorily negligent, the court eventually entered judgment of $1,333,333.34 for Brent and $166,666.66 for Harry. In addition, the final judgment held Cutro liable to plaintiff as a matter of law, to the extent of Revy's liability, pursuant to § 48(1) of the New York Navigation Law on account of Cutro's having rented to Revy the boat that struck Brent (*see* Part II.B. below).

A number of posttrial motions were made by the defendants. All of the appellants moved for judgment notwithstanding the verdict or for a new trial, on the ground that the amounts awarded by the jury were excessive. In addition, Kawasaki moved for judgment n.o.v. on the ground that plaintiff had not established a prima facie case and had not proven that Brent's injury was caused by any act or failure to act by Kawasaki; alternatively, it sought a new trial on the grounds that the court had admitted irrelevant evidence and that the verdict finding Kawasaki liable was inconsistent with the verdict finding Cutro not liable. Cutro moved, *inter alia*, for indemnification from Revy and Kawasaki. All of these motions were denied, and these appeals followed.

## II. THE LIABILITY ISSUES

On appeal, Kawasaki and Cutro pursue, *inter alia*, the contentions made in their posttrial motions, arguing that the court erred in various rulings affecting their liability. We have considered all of their contentions and find them unpersuasive.

### A. *Kawasaki*

Kawasaki argues that the finding that it is liable should be set aside because (1) the court admitted irrelevant testimony into evidence, (2) plaintiff failed to prove his case against Kawasaki, (3) plaintiff's summation deprived it of a fair trial, and (4) the verdict against Kawasaki cannot stand in light of the verdict in favor of Cutro. We disagree.

### 1. *Relevance*

Over Kawasaki's objection, plaintiff's experts were permitted to testify as to the instability of the Jet Ski and the difficulties

---

**1.** This ruling, challenged on appeal only by Kawasaki and Cutro, was correct. Although the Village issued a license to Cutro to operate his business, under New York law "[i]t is well established that '[a]bsent a special relationship creating a municipal duty to exercise care for the benefit of a particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation.'" *O'Connor v. City of New York*, 58 N.Y.2d 184,

189, 460 N.Y.S.2d 485, 486–87, 447 N.E.2d 33 (1983) (quoting *Sanchez v. Village of Liberty*, 42 N.Y.2d 876, 877–78, 397 N.Y.S.2d 782, 366 N.E.2d 870 (1977), *dismissed on other grounds*, 44 N.Y.2d 817, 406 N.Y.S.2d 295, 377 N.E.2d 748 (1978)). As no such special relationship was shown here, the court properly determined that the Village was not liable to plaintiff or to the other defendants.

in its operation. The evidence included testimony that a Jet Ski was unstable at slow speeds or when stopped; that neither the range of planing speeds nor the turning radius was disclosed; that a Jet Ski was noisy; that it was difficult to get back on; that a Jet Ski was not suitable for use in towing and rescue operation; and that it was not crashworthy. Kawasaki contends that because Brent was proceeding straight ahead and in a planing position when the accident occurred, the evidence as to the behavior of the craft in any other manner of operation was irrelevant and prejudicial, and hence was improperly admitted. With the obvious exception of the evidence that the Jet Ski could not be used for towing and rescue, all of the items challenged by Kawasaki were properly admitted.

 Rule 403 of the Federal Rules of Evidence states in part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." The trial court has broad discretion in determining whether proffered evidence should be admitted, *see United States v. Robinson,* 560 F.2d 507, 513–15 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), and in general in the "absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded," *United States v. Jamil,* 707 F.2d 638, 644 (2d Cir.1983). The district court did not abuse its discretion in this case.

First, Kawasaki has an unduly narrow conception of relevance. The defendants opposed plaintiff's claims in part on the ground that the accident had been caused by Brent's own negligence. Thus, while the Jet Ski may not have been unstable at the moment of the accident, design flaws and undisclosed parameters for optimal operation were pertinent to the difficulties a beginner such as Brent might have with the Jet Ski, causing him not to notice an approaching boat. If, for example, Brent was forced to concentrate exclusively on staying on the Jet Ski, and in order to maintain his balance was required to forgo

turning his head, it is unlikely that he could adequately be alert to imminent dangers. The evidence had substantial probative value, and we see no abuse of discretion in the court's determination that that value outweighed any unfair prejudice to Kawasaki from its admission. In any event, even if one or more of the items complained of should have been excluded, we conclude that it is unlikely that Kawasaki was prejudiced, a conclusion that is supported by the jury's finding that the design defects in the Jet Ski were not a substantial factor in bringing about Brent's injury.

### 2. *Plaintiff's Prima Facie Case*

The jury found that Kawasaki was negligent in failing to provide adequate warnings of potential dangers associated with foreseeable uses of the Jet Ski and that this failure to warn was a proximate cause of Brent's injury. Because the jury also found that the design defects in the Jet Ski were not a substantial factor in causing Brent's injury, Kawasaki contends that it was entitled to judgment n.o.v. on the ground that the latter determination meant that the design defects were irrelevant and that the failure to warn as to the defects thus could not have been a substantial factor in causing the injury.

 Viewing the evidence in the light most favorable to the plaintiff, *e.g., Fortunato v. Ford Motor Co.,* 464 F.2d 962, 965 (2d Cir.), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972), we conclude that there was adequate evidence from which reasonable jurors could conclude that Kawasaki breached a duty to warn of potential dangers associated with foreseeable uses of the Jet Ski. There was proof as to the Jet Ski's lack of visibility because of its color and size, its lack of stability, and its unusual handling characteristics. There was testimony that rough water conditions made the craft even more difficult to handle and even less visible to others. Given this evidence and the testimony that the handling characteristics of the Jet Ski forced many novice riders to forgo looking anywhere but straight ahead,

the jury was entitled to find both that warnings were required and that the general warnings on the Jet Ski were inadequate.

### 3. *Plaintiff's Summation*

■ Kawasaki argues that plaintiff's counsel's summation deprived it of a fair trial by repeatedly referring to a letter from Brent to his psychiatrist listing activities that Brent could no longer perform, which letter was not in evidence; by offering counsel's personal opinions; and by making improper attacks on opposing counsel. Kawasaki made no objections to any of these statements during the summation, however, and as it has failed to show any "flagrant abuse," its present arguments have been waived. *See United States v. Perry,* 643 F.2d 38, 51 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *cf. United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 238–39, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940).

Even were we to consider Kawasaki's arguments, however, we would find them to be without merit. For example, although Brent's letter to his psychiatrist was not physically admitted into evidence, the list of acts Brent could not perform was before the jury because the psychiatrist had read the list to the jury—without objection from Kawasaki. Much of the material in the letter was also testified to by other witnesses.

Nor would the other statements of plaintiff's counsel to which Kawasaki now objects require reversal. We agree that counsel's references to his own hard work were out of place and that counsel could more properly have suggested that certain evidence did not present a complete picture without repeatedly referring to opposing counsel in such disparaging terms as "masters of the half-truth." There is no indication in this case, however, that "the minds of the jurors [were] so influenced by such incidental statements … that they would not appraise the evidence [as to Kawasaki's negligence] objectively and dispassionately." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. at 239, 60 S.Ct. at 851.

### 4. *The Inconsistent Verdicts*

■■ Finally, we find no merit in Kawasaki's argument that it is entitled to a new trial on the ground that the jury's finding that Cutro was not negligent in renting the Jet Ski to Brent was logically irreconcilable with the jury's finding that Kawasaki was negligent in failing to provide adequate warnings. When a claim is made that a jury's answers to special interrogatories are inconsistent, our responsibility as a reviewing court is to adopt a view of the case, if there is one, that resolves any seeming inconsistency. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). For the reasons that follow, we conclude that the verdicts as to Kawasaki and Cutro are not necessarily inconsistent.

■ It is clear that a manufacturer has a duty to warn of the potential hazards in the use of its products, *e.g., Lancaster Silo & Block Co. v. Northern Propane Gas Co.,* 75 A.D.2d 55, 65, 427 N.Y.S.2d 1009, 1015 (4th Dep't 1980), and the jury was so instructed. The jury was not, however, instructed that Cutro as a vendor of the product also had a duty to warn. The court merely instructed the jury that it was to determine whether Cutro was negligent "in renting" the Jet Ski—or the motorboat—and if it determined that he was, whether that negligence was the proximate cause of the accident. So far as appears, no party requested an instruction that explained to the jury any duty on the part of Cutro to warn of defects in the Jet Ski manufactured by Kawasaki. And the pertinent interrogatory to the jury asked simply, "Was defendant Cutro negligent in renting the Jetski [*sic*] to Brent Martell?" As the jury was not informed of Cutro's duty to warn, its finding that Cutro was not negligent "in renting" the Jet Ski has

no logical bearing whatever on its finding that Kawasaki was negligent in failing to give warnings.

◼ Further, even had the jury been instructed that Cutro had a duty to give warnings, we would not view the jury's findings as necessarily inconsistent. Under New York law, the duty of a manufacturer to warn of potential hazards in its products is sometimes greater than the duty of a mere vendor to warn. *See Cover v. Cohen*, 61 N.Y.2d 261, 275, 473 N.Y.S.2d 378, 386, 461 N.E.2d 864 (1984) ("The manufacturer and the vendor do not necessarily have the same obligation to warn concerning dangers learned of after delivery of the product . . . ."). The differing duty to warn is grounded in the different information that the manufacturer and the vendor may possess as to the hazards of a product. *Id.* at 275, 473 N.Y.S.2d at 385, 461 N.E.2d 864. There was evidence in the present case from which the jury could infer that Kawasaki had received reports of accidents involving the Jet Ski and calling into question the safety of its design, and that Kawasaki thereby had knowledge of flaws, defects, or hazards that were not known to Cutro.

In sum, the jury was entitled to conclude that Cutro's and Kawasaki's respective duties differed, and to find that Cutro as vendor had satisfied his duty while Kawasaki as manufacturer had not satisfied its duty. Accordingly, there was no inconsistency in the verdicts.

### B. *Cutro*

Cutro's principal arguments with regard to liability are that the district court erred in refusing to inform the jury that Cutro could be held vicariously liable for the accident pursuant to New York Navigation Law § 48(1), and in denying his posttrial motion for indemnity from Kawasaki and Revy.[2] Neither contention need detain us long.

◼ Section 48(1) of the New York Navigation Law provides, in relevant part, as follows:

> Every owner of a vessel used or operated upon the navigable waters of the state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vessel, in the business of such owner, or otherwise, by any person using or operating the same with the permission, express or implied, of such owner.

N.Y.Nav.Law § 48(1) (McKinney Supp. 1983–1984). There were no issues of fact to be decided by the jury in relation to this statute. Cutro admitted in his answer to the complaint that he was in the business of renting boats, that he owned the boat in question, and that he had rented it to Revy. Since there was no disputed factual issue for the jury to decide, informing the jury of the statute was unnecessary. Indeed, to the extent that the jury was disinclined to impose liability on Cutro, giving the jury this information might have introduced an irrelevant factor into the jury's consideration of the liability of Revy. The court properly rejected the requested charge.

◼ Cutro's argument that the district court erred in denying his motion for indemnity from defendants Kawasaki and Revy fares no better. Even assuming that indemnity is available in light of N.Y. Nav.Law § 48(1), such a claim must be asserted with particularity in a cross-claim, *e.g.*, *Glasgow v. Drakes*, 5 A.D.2d 693, 693–94, 169 N.Y.S.2d 603, 605 (2d Dep't 1957), and Cutro's answer did not include any cross-claims. Cutro made no motion to

---

**2.** Cutro also contends that the district court abused its discretion in denying his motion to amend his answer to assert an affirmative defense based on 46 U.S.C. § 183(a), which provides that "[t]he liability of the owner of any vessel . . . for . . . injury by collision . . . shall not . . . exceed the amount or value of the interest of such owner in such vessel . . . ." The motion was made nearly three years after suit was brought against Cutro and was made just months before the case was to be tried. Cutro offered no acceptable reason for the delay, and the introduction of this defense could well have injected new issues and delayed the start of trial. We see no abuse of the court's discretion in denying the belated motion.

amend his answer to introduce a cross-claim for indemnity until the eve of trial, and we see no abuse of discretion in the court's denial of that belated motion, or of Cutro's postjudgment efforts to obtain indemnification.[3]

## III. DAMAGES

### A. Standard of Review

■ All of the appellants contend that the jury's awards of $2,000,000 to Brent and $250,000 to Harry were grossly excessive and must be set aside.[4] Even giving due deference to the factfinding role of the jury and the role of the trial court in declining to set aside the verdicts, we must agree.

■ In reviewing a claim of excessive damages, an appellate court must accord substantial deference to the jury's determination of factual issues. *See Wheatley v. Ford,* 679 F.2d 1037, 1039 (2d Cir. 1982). The trial court's refusal to set aside or reduce a jury award will be overturned only for abuse of discretion. *See, e.g., Batchkowsky v. Penn Central Co.,* 525 F.2d 1121, 1124 (2d Cir.1975); *Dagnello v. Long Island Rail Road Co.,* 289 F.2d 797, 806 (2d Cir.1961). Nevertheless, a judgment cannot be upheld where the damages awarded are so excessive "as to shock the judicial conscience." *United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 589 (2d Cir.1975); *see Dagnello v. Long Island Rail Road Co.,* 289 F.2d at 806 ("[S]urely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.").

■ In determining whether an award is so excessive as to shock the judicial conscience, we look, as a court sitting in diversity, to other jury awards condoned by the courts of the state whose substantive law governs the rights of the parties, in this case New York State. While there are difficulties inherent in comparing one personal injury award to another because differentiating facts in each case "limit the precedential value of a court's treatment of awards in other apparently similar cases," *Batchkowsky v. Penn Central Co.,* 525 F.2d at 1125, we nonetheless have the responsibility to ensure "that the damage award does not exceed that which could be sustained were the case before the highest court of the state whose substantive law gives rise to the claim," *Hysell v. Iowa Public Service Co.,* 559 F.2d 468, 472 (8th Cir.1977).

New York appellate courts regard prior awards as not binding but instructive. *E.g., Senko v. Fonda,* 53 A.D.2d 638, 639, 384 N.Y.S.2d 849, 851 (2d Dep't 1976) (prior awards "may guide and enlighten the court[s]" "in the exercise of their discretion"). Jury verdicts and judicial opinions approving or disapproving them, when considered over a period of time, provide "some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the injury and the amount of compensation to be awarded." *Id.* at 639, 384 N.Y.S.2d at 851–52.

Accordingly, we examine in turn the awards to Brent and Harry in light of the evidence and of the consensus of New York state juries and courts in recent cases involving similar injuries.

### B. The Award to Brent

Brent's physical injuries consisted of the loss of his left arm; injuries to the posteri-

---

**3.** We note that since such a cross-claim is permissive, *see, e.g., Augustin v. Mughal,* 521 F.2d 1215, 1216 (8th Cir.1975), Cutro may be able to assert his claim for indemnity in another proceeding.

**4.** Under New York law, the excessiveness of damages must be measured in terms of the gross verdict awarded for damages and not measured against the net judgment entered after reduction for plaintiff's comparative negligence. *See Alvez v. America Export Isbrandtsen Lines,* 79 A.D.2d 590, 434 N.Y.S.2d 384 (1st Dep't 1980). Thus, we must evaluate the excessiveness of the verdicts of $2,000,000 and $250,000 rather than of the judgments reducing these amounts by ⅓, which reflect the degree of Brent's own negligence.

or shoulder scapula and in the chest area, including fractures of two ribs; a collapsed lung which had been punctured by one of the broken ribs; and contusions and hematoma of the left back and chest areas. The evidence indicated that Brent did not suffer exceptional pain as a result of his injuries. He testified that he felt no real pain at the time of the accident; his father testified that Brent did not begin to complain of pain until well into the ambulance trip to the hospital. Brent was in Glens Falls Hospital for nine days, in intensive care for four. He suffered intense pain for the four days in which he was in intensive care, thereafter suffered some "phantom pain" relating to the severed portion of his arm, and suffered some pain after his discharge from the hospital. He required little medical treatment after his release from the hospital. By the time of trial, Brent had completely recovered from his physical injuries, with the obvious exception of the loss of his arm.

Plaintiff presented evidence that there was a long list of activities Brent could not undertake with one hand, such as tie his shoelaces, cut steak, peel an orange, play golf, drive a manual shift car, and push a wheelbarrow. (Some of the listed tasks would likely have been performable had Brent not refused to wear the prosthetic arm with which he had been fitted.) Nonetheless, the evidence was that after the accident Brent had been able to resume many of his former activities. He returned to school less than three weeks after the accident. He maintained the close friendships he had had prior to the accident. He skied, taught skiing, and competed in ski races; he played squash on a school team and played center on his high school's varsity football team; he sailed in competition; and he made sketches and painted a mural. For the summer after the accident he had a job on a lake patrol rescue unit and apparently performed very well.

There was also evidence that Brent had experienced some psychological problems as a result of the amputation. His parents testified that, although his relationships with others seemed to proceed well after the accident, Brent became morose, rebellious, and uncommunicative toward his parents, with anger directed principally toward his mother.[5] Plaintiff presented the testimony of one psychiatrist, Dr. Camperlengo, and one clinical psychologist, Dr. Marrazo, neither of whom had seen Brent prior to the commencement of the lawsuit. They had been contacted by plaintiff's attorney, who was concerned, as Dr. Camperlengo put it, that Brent

> did not want to visit with doctors, and seemingly having no complaints after he had had a terrible traumatic amputation of the arm, and that he was rather, if not uncooperative, as I said, noncompliant. He was not meeting his doctors' appointments and he seemed to convey this impression that everything was all right.

Dr. Camperlengo testified that he had a single two-hour session with Brent in April 1981, during which he found Brent to be "cooperative, chatty," "open," and "practically lighthearted." Brent said that he may have felt temporarily depressed when he was in the hospital, but had suffered no depression thereafter. He presented a demeanor of "saying that this has never happened and this has not made any impression on me, and I won't let it." Brent stated that he had not had psychiatric care prior to seeing Dr. Camperlengo because he felt he had not needed it.

Dr. Camperlengo concluded that Brent felt good about his life, but that he felt "too good"; that he "was too carefree. He was too unconcerned. He was too free of depression, and when this occurs what you are looking at is depression turned inside out." He opined that Brent had a repressed posttraumatic stress disorder, or

---

**5.** After the accident Brent apparently was disruptive in his high school and his parents sent him away to a succession of private schools, most of which he did not want to attend. He had truancy problems except at the last such school but was not allowed to return to that school because his grades were too low. Prior to the accident Brent had been at best an average student, receiving several failing grades.

repressed depression; and that eventually Brent's facade of gaiety would wear thin and his depression would emerge. Dr. Camperlengo had recommended that Brent be given psychiatric treatment.

Brent received treatment from Dr. Marrazo in six sessions at four-to-six-week intervals beginning in January 1983. Dr. Marrazo agreed that Brent was suffering from chronic depression and chronic dysphoria and that he was angry and had low self-esteem. In Dr. Marrazo's view, Brent had been denying his true feelings and had not been able to face up to the fact that he was now a person with only one arm and that he was going to be very limited in his ability. Dr. Marrazo asked Brent to make a list of all the things he could no longer do, and Brent supplied him with such a list, which Dr. Marrazo read to the jury. He felt that Brent had been very unrealistic in his aspirations, for example, to go out and play football again. (He was unaware until trial that by 1981 Brent had indeed been playing football again, and well enough to make his high school varsity team.) Dr. Marrazo stated that toward the last of his sessions with Brent, Brent had been making improvement and was moving in the right direction. The only testimony on the subject of further psychological treatment for Brent was Dr. Marrazo's answer to the question "[D]o you plan on seeing him from time to time in the future?" Dr. Marrazo's response was, "I hope so, sure."

The only diagnosis in the trial record by a psychologist who saw Brent before the lawsuit was started was the evaluation of a clinical psychologist associated with Glens Falls Hospital, who had talked with him in September 1979, less than two weeks after the accident. The hospital psychologist was not called as a witness, but his notes were read to the jury by Dr. Marrazo in response to questioning by plaintiff's attorney. The notes stated that Brent "ventilated feelings" about the accident, the loss of his arm, and his fears as to the future and how others would react to his amputation. Brent evinced anger and sadness, but the psychologist did not believe he was "clinically depressed." Brent discussed his phantom pains and his desire to continue to play football, and expressed determination to keep the loss of his arm from interfering with his life. The notes concluded, "I would say he is making satisfactory emotional adjustment."

The evidence was that at the time of trial, September 1983, Brent was faring quite well. He was enrolled in a junior college and, according to his parents, had a very positive attitude and was studying hard. He had a girl friend. His mother testified that Brent's behavior was now very good and had been since the springtime. Harry concluded, "His mother and I are both happy."

Plaintiff presented no evidence that the accident had interfered with Brent's career plans or any evidence that the loss of his arm had any impact on Brent's earnings or his future earning ability.

■ In sum, plaintiff showed that Brent lost his left—non-dominant—arm, suffered other relatively minor injuries, and suffered some psychological problems. The evidence did not show, however, any diminution of Brent's earning power, did not show extreme pain and suffering, did not show enduring emotional or physical pain; it did show Brent's reasonable return to an active, athletic life.

In light of the evidence, the award to Brent of $2,000,000 appears to be extremely high. This impression is enhanced when we compare that award with awards for similar injuries condoned by New York state courts. *See, e.g., Novell v. Carney Electric Construction Corp.,* 123 Misc.2d 1089, 1090, 1096–97, 476 N.Y.S.2d 241, 244, 247–48 (Sup.Ct.N.Y. County 1984) (apparently reducing award for pain and suffering for loss of leg from $7,000,000 to approximately $630,000); *Le Bel v. Airlines Limousine Service, Inc.,* 92 A.D.2d 996, 461 N.Y.S.2d 474 (3d Dep't 1983) (upholding award of $800,000—which included compensation for substantial economic loss—for crushing of leg that would require amputation, had caused and would continue to cause pain, and had required five extensive hospitaliza-

tions); *Terry v. State*, 79 A.D.2d 1069, 1069, 435 N.Y.S.2d 389, 390 (3d Dep't 1981) (increasing to $400,000 an award to 18-year-old boy whose left arm was rendered useless and who had suffered and was expected to suffer "excruciating pain" in the future); *Prata v. National Railroad Passenger Corp.*, 70 A.D.2d 114, 420 N.Y.S.2d 276 (1st Dep't) (reducing award for loss of hand from $1,250,000 to $700,000), *appeals dismissed*, 48 N.Y.2d 975, 425 N.Y.S.2d 1029, 401 N.E.2d 433 (1979); *Dubicki v. Maresco*, 64 A.D.2d 645, 407 N.Y.S.2d 66 (2d Dep't 1978) (upholding award of $810,000 for deeply lacerated groin and injury resulting in complete disuse of right leg with threat of amputation); *Kraft v. Carborundum Co.*, 57 A.D.2d 697, 395 N.Y.S.2d 542 (4th Dep't 1977) (upholding award of $325,000—which included compensation for 17.2 years of lost future income—for loss of left leg); *Kusisto v. McLean*, 52 A.D.2d 674, 675, 382 N.Y.S.2d 146, 147 (3d Dep't 1976) (reducing from $510,000 to $400,000 an award that included future earnings for an 18-year-old boy whose left leg was amputated at mid-thigh who was "completely disabled from pursuing his chosen endeavor and, in fact, from performing any activity which requires mobility").

Sums of the magnitude of that awarded to Brent have been approved by New York courts only in cases that involved injuries much more severe than that suffered by Brent. For example, in *Rush v. Sears, Roebuck & Co.*, 92 A.D.2d 1072, 461 N.Y.S.2d 559 (3d Dep't 1983), the appellate court reduced a $4,000,000 award to a teenage girl who had suffered second and third degree burns over 42% of her body, resulting in "long and painful periods of hospitalization and treatment, skin grafting, debridement, permanently disfiguring scars and excruciating pain and suffering," to $1,500,000. The court pointed out that notwithstanding the nature of the injuries and her terrible pain and suffering, plaintiff had been

> able to return to school in September following the fire and was a student at the State University at Brockport study-

ing computer science and math at the time of trial. She sings in her college choir and with several area dance bands. She was employed at Sherman's Amusement Park on Caroga Lake during the summer before trial. She is not bedridden, shut in, or in need of constant custodial care, or helpless. She is able to attend to her own needs and her mental faculties remain unimpaired. She is an active member of society and will be able to pursue gainful employment when she completes her education.

*Id.* at 1073, 461 N.Y.S.2d at 561. In reducing this award to $1,500,000, the court noted that in *Caprara v. Chrysler Corp.*, 71 A.D.2d 515, 524, 423 N.Y.S.2d 694, 699 (3d Dep't 1979), *aff'd*, 52 N.Y.2d 114, 436 N.Y.S.2d 251, 417 N.E.2d 545 (1981), it had reduced an award for pain and future earnings from $3,600,000 to $2,000,000 for a plaintiff rendered a quadriplegic who was expected to suffer a lifetime of pain and helplessness. *See also Poulos v. City of New York*, 99 A.D.2d 709, 472 N.Y.S.2d 3 (1st Dep't 1984) (reducing to $1,000,000 an award for pain and suffering to 16-year-old rendered a paraplegic); *Tabone v. New York*, 116 Misc.2d 864, 869–72, 456 N.Y.S.2d 950, 955–57 (Ct.Cl.1982) (awarding approximately $2,000,000, including lost earnings, to severely burned and grotesquely scarred plaintiff whose appearance could not be improved by plastic surgery, and who, *inter alia*, lost ⅔ of the use of each hand, was initially hospitalized for 72 days and later hospitalized an additional 18 times).

Thus, the guidance we receive from the recent New York cases is that the awards condoned for the loss of a single limb have ranged from $325,000 to $810,000. The award to Brent of $2,000,000, if designed principally to compensate him for the loss of his arm and his other physical injuries must be considered to be at least twice as high as what is permissible.

Nor can the award be justified on the theory that the jury sought to compensate Brent principally for the psychological

damage suffered for the loss of his arm, for the evidence does not come close to supporting such an extravagant award. The only psychiatric evaluation of Brent prior to the start of this lawsuit was a positive one. It noted normal fears, anger, and sadness; Brent's determination to keep the loss of his arm from interfering with his life; and his desire to continue to play football. And it concluded that Brent was making satisfactory emotional adjustment. Brent did thereafter resume many of his prior physical activities and by the time of trial his parents testified that he was doing very well. The evidence in no way suggested that Brent's mental faculties were impaired or that he was helpless. Rather, he has been an active member of society, and there was no indication that he will be unable to pursue gainful employment when he completes his education.

The jury may have accepted both the views of Brent's parents that the teenager's rebelliousness toward them resulted from the accident and the opinions of Drs. Camperlengo and Marrazo that Brent's self-possessed and upbeat exterior with others had masked repressed angry feelings and low self-esteem as a result of his amputation. But even if the jury entirely accepted those contentions, there was no evidence of any more serious psychological problem or of any enduring injury. Such evidence as there was was woefully insufficient to support any substantial portion of an award of $2,000,000.

We do not regard the New York cases as setting a maximum on the plaintiff's permissible recovery, but only as providing guidance as to levels of recovery that are realistic rather than fanciful. In light of the guidance provided, we conclude that the evidence in this case cannot justify an award to Brent in excess of $1,200,000. Since Brent was found to have been at fault to the extent of one-third of his injuries, judgment in his favor should not have been entered in an amount in excess of $800,000.

### C. The Award to Harry

 The parent of an injured child is entitled to recover from the tortfeasor for the parent's resulting pecuniary loss, including expenditures for the treatment of the infant and the value of the infant's services that were lost. *Gilbert v. Stanton Brewery*, 295 N.Y. 270, 67 N.E.2d 155 (1946). Under New York law, the parent may not recover for the loss of the child's companionship or society. *Id.; Foti v. Quittel*, 19 A.D.2d 635, 241 N.Y.S.2d 15 (2d Dep't 1963). All claimed pecuniary losses, including loss of services, must be proved in order to sustain an award for such loss. *Id.*

The trial court charged the jury that Harry was entitled to recover damages for expenses incurred by reason of the medical, hospital, nursing services, and other expenses made necessary as a result of his son's injuries, and for the pecuniary loss Harry sustained by the loss of his son's services from the time of the accident to the age of 21. Plaintiff proved expenditures totaling nearly $26,000. The jury awarded Harry $250,000. On the evidence adduced, this award was grossly excessive.

Each appellant takes a slightly different view as to the excessiveness of the award to Harry. Kawasaki argues, without citing any compelling authority, that Harry was not entitled to recover the approximately $21,000 spent on sending Brent to private schools after the accident (*see* note 5 *supra*) and that only some $4,000 in medical expenses were recoverable. Thus it argues that the jury awarded $246,000 for loss of services, which would amount to more than $50,000 a year for the period until Brent reached majority at the age of 21. Revy assumes that the education expenses were recoverable as special damages; he thus calculates the award to Harry for loss of Brent's services as $224,000, or $45,000 a year. Cutro argues that even if the education expenses were properly included as special damages, the award to Harry for lost services exceeded $112,000 a year, because Brent reached majority at age 18, not 21. Revy's position is the most reasonable.

Although defendants objected at trial to the introduction of proof as to the education expenses, they did not request the trial judge to charge that those expenses were not recoverable as special damages. Nor have they cited to this Court any authority on point. We thus assume that the jury awarded compensation to Harry for education expenses as part of his special damages, and that the special damage award amounted to approximately $26,000, with the remainder, $224,000, being an award for loss of services.

As to the proper age of majority, no defendant asked the trial judge to charge the jury that Harry was not entitled to recover for the loss of Brent's services past the age of 18, and there was no objection to the court's instruction using the age of 21. Nor do we think such an objection would have been well taken. Although in 1974 New York lowered the age of majority from 21 to 18 for many purposes, *see, e.g.*, N.Y.Dom.Rel.Law § 2 (McKinney 1977); N.Y.Civ.Prac.Law § 105(j) (McKinney Supp. 1983–1984), it did not do so for all purposes, *see id.* Supplementary Practice Commentaries. A parent remains obliged to support a child until age 21, N.Y. Dom.Rel.Law § 32, and thus is entitled to recover from a tortfeasor for medical expenses occasioned by the injury of the child until the child is 21, *Clough v. Board of Education*, 56 A.D.2d 233, 236, 392 N.Y. S.2d 170, 173 (4th Dep't 1977). We have seen no basis for believing that the duration of the parent's entitlement to the child's services is not coextensive with the duration of his obligation of support.

The jury's award of $224,000 for the loss of Brent's services was thus for the four years and eleven months between the date of the accident and Brent's majority at age 21, and averaged more than $45,000 a year. The evidence as to the services that were lost, however, was scant in the extreme, consisting of a few statements that Brent could no longer perform household chores such as helping with garden-ing, painting, and hanging wallpaper. The award of $45,000 a year for the loss of these services is outrageously extravagant and is many times higher than any award condoned by New York courts in any case involving a parent's claims for the loss of services of an injured child. *See, e.g., Pratt v. Susquehanna Valley Central School District*, 62 A.D.2d 1118, 404 N.Y. S.2d 435 (3d Dep't 1978) (reducing award for loss of one year of junior-high-school-age infant's services from $9,000 to $3,000); *Florence v. Goldberg*, 57 A.D.2d 914, 395 N.Y.S.2d 57 (2d Dep't 1977) (reducing award to mother for loss of 6½-year-old child's services from some $14,000 for each year of the child's minority to approximately $4,000 a year), *aff'd*, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978); *Kusisto v. McLean*, 52 A.D.2d at 675, 382 N.Y.S.2d at 148 (reducing award for loss of two years of services of 18-year-old from $20,000 to $16,000, or $8,000 a year).

In light of the guidance provided by the New York cases, we conclude that the scanty evidence in the present case could not justify an award of damages to Harry of as much as $7,000 per year for the remainder of Brent's minority. Given that the evidence supported an award to Harry of approximately $26,000 in special damages, we conclude that any total award in excess of $60,000 was excessive. Taking into account the extent to which Brent was found contributorily negligent, therefore, judgment on Harry's claims should not have been entered in an amount in excess of $40,000.

### D. *The Remittitur and the Scope of the Conditional New Trial*

In light of the excessiveness of the awards, we order a new trial on the issue of damages unless plaintiff agrees to remit all damages in excess of $800,000 as to Brent and $40,000 as to Harry. *See Wheatley v. Ford*, 679 F.2d at 1039; *O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1089–90 (2d Cir.1978).

■ We note that a new trial limited to the question of damages is permissible here, since the issue to be retried is sufficiently distinct from the other issues that a separate trial may be had without injustice, *see Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); Fed.R.Civ.P. 59(a); and is appropriate since special interrogatories discretely dealing with the liability questions and the damage awards were put to the jury, *see Crane v. Consolidated Rail Corp.,* 731 F.2d 1042, 1050 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984); *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898, 906 (2d Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983); *Rivera v. Farrell Lines, Inc.,* 474 F.2d 255, 259 n. 5 (2d Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973). The trial judge clearly instructed the jury not to consider the measure of damages unless it found plaintiff entitled to recover from one or more of the defendants, and we see no basis for supposing that the jury confused the issues.

If plaintiff agrees to the remittitur, the liability of Revy and Kawasaki on the judgment shall be in accordance with the jury's apportionment of fault, taking into account the reduction already made herein on account of Brent's contributory negligence, and Cutro shall remain vicariously liable to the extent of Revy's liability. If a new trial is held, a judgment entered on the new verdicts shall reflect the first jury's apportionment of fault and Cutro's vicarious liability.

CONCLUSION

Affirmed as to findings of liability. Reversed and remanded for a new trial on the issue of damages unless plaintiff accepts a remittitur of all sums in excess of $800,000 for Brent and $40,000 for Harry. Revy shall recover his costs on this appeal from plaintiff; the Village shall recover its costs on this appeal from Kawasaki and Cutro. All other parties shall bear their own costs.