Victor BEVEVINO, Plaintiff,

v.

M. S. SAYDJARI and Community General Hospital of Sullivan County, Defendants.

No. 75 Civ. 2848.

United States District Court,
S. D. New York.

Aug. 4, 1977.
As Amended Sept. 12, 1977.

Gerald Orseck, Donald I. Orseck, Liberty, N. Y., for plaintiff.

Anthony L. Schiavetti, New York City, Arthur N. Seiff, New York City, of counsel, for defendant Saydjari.

## OPINION

WHITMAN KNAPP, District Judge.

■ Before the court is a motion by defendant doctor [1] (actually, as will be seen, by his malpractice insurance carrier) to set aside a verdict in the amount of $550,000 for negligent medical care resulting in the loss of plaintiff's right eye. In support of

this motion it is contended that the finding of liability should be set aside in the court's discretion to prevent a miscarriage of justice, that certain evidence was admitted in error and that the verdict is excessive.[2]

The basic problem posed by this motion arises from two conclusions at which the court has arrived: *first*, that as a matter of actual fact the finding of liability was altogether unwarranted, but *second*, that on the basis of the testimony adduced at trial the jury was fully justified in making such a finding. The apparent inconsistency of these two conclusions appears to arise out of the circumstance that defendant's malpractice insurance carrier, Employer's Insurance of Wausau, deliberately decided not to provide the defendant with the semblance of a defense. In short, it is the court's opinion that the verdict resulted from the carrier's willful default.

We shall first consider the facts which have brought us to the conclusion that the carrier is guilty of willful default, and shall then consider the legal consequences of such default upon the contention that the finding of liability should be set aside. We shall then consider whether, on the record actually before us, the verdict is excessive.

## I

### FACTS ESTABLISHING THE CARRIER'S WILLFUL DEFAULT

In the early hours of June 17, 1973 plaintiff was the victim of a severe automobile accident, the car in which he was a passenger having crashed at high speed into a tree. At 1:25 A.M. he was admitted to the Community General Hospital of Sullivan County in an apparently dying condition. His injuries included a fractured spine, several fractured ribs, a lacerated scalp, multiple abrasions and a severely damaged right

---

1. This action was originally brought against Dr. Saydjari and the Community General Hospital of Sullivan County. The case against the Hospital was dismissed after plaintiff rested.

2. Defendant also moves for a judgment notwithstanding the verdict and dismissal of the complaint on the ground that the verdict is unsupported by any evidence. We deem this motion to be frivolous.

eye (Tr. 155, 177–178, 340).[3] Defendant doctor, being on call, treated plaintiff in the emergency room until 3:00 A.M. His condition having stabilized, he was then removed to the intensive care unit (Tr. 157–159).

Except for his eye, his injuries were successfully treated by defendant doctor, and plaintiff has since fully recovered therefrom. However, nothing much but palliative treatment was accorded to the eye, and after six days plaintiff was removed to another hospital where the eye was enucleated (removed).

Two highly competent ophthalmologists, the one who performed the enucleation and one called as an expert by the defense, gave it as their opinion that the eye had been destroyed at the moment of impact, and was wholly beyond saving when defendant doctor first encountered plaintiff. The contrary testimony of an expert called by plaintiff appeared to us to be equivocal.

Why then, the defendant doctor apparently having saved plaintiff's life and having had nothing to do with the loss of his eye, did the jury award a $550,000 verdict against him? The answer, as we have indicated, is that the defendant's malpractice carrier did not afford him the semblance of a defense.

The complaint asking damages in the amount of one million dollars was filed on June 13, 1975. It must have been apparent upon cursory view of the situation that crucial to any proper defense would be defendant doctor's testimony concerning his first encounter with plaintiff, his diagnosis of plaintiff's then critical condition, and his decision to concentrate on saving plaintiff's life rather than on treating the apparently hopeless eye. Incredible as it may seem, by November 4, 1976 when at a pretrial conference a trial date was scheduled, no attorney representing the carrier had so much as spoken to the doctor about his version of the case.[4] Moreover, the carrier did not even then have anyone knowledgeable of the situation speak to him. On the contrary, the defendant having retired to live in Texas, the carrier retained local counsel to "represent" him at a deposition demanded by plaintiff. It appears from the transcript of that deposition that such local counsel did not even trouble to prepare his "client" to the minimal extent of letting him review the medical records he had created some 3½ years previously. Defendant first saw those records when plaintiff's counsel confronted him with them as the deposition progressed. The result was pre-

---

**3.** As will appear, there was no medical testimony as to the extent, if any, to which these injuries constituted an immediate threat to the plaintiff's life. Defendant counsel's opening mentioned that the plaintiff had received the last rites of his church, but no evidence to that effect was presented.

**4.** The procedural history of the case against defendant doctor is as follows: The complaint was filed on June 13, 1975. On July 23, 1975 an answer was filed together with a notice requesting the plaintiff to furnish written authorizations permitting inspection of pertinent hospital records. On the same day interrogatories were served upon the plaintiff. In September, 1976 a pretrial conference was held at which time all parties agreed to answer outstanding discovery requests and to return a month later for another conference.

There followed some skirmishing about discovery. On November 4, 1976 it was agreed that defendant doctor would submit to a deposition by plaintiff, and that the parties would be ready for trial on Monday, February 21, 1977. Upon defense counsel's representation that the doctor was suffering from an illness resulting

in partial blindness and had become a permanent resident of Texas, it was agreed that in order to save him an unnecessary trip to New York the deposition would take place on the Friday preceding trial.

On Tuesday, February 15 a pretrial conference was held at defendant's request. Defense counsel announced that there had been a flare-up in the doctor's illness, that he would be unable to travel and accordingly that both parties would have to rely on his deposition testimony to be taken in Texas. The trial date was postponed to Thursday, February 24th to allow time for taking the deposition. On that day, defense counsel announced that he was not ready to proceed because, the doctor having been represented at the deposition by Local Texas counsel and the transcript not having been received, he (trial counsel) had no idea what his client's position on the issues might be. The jury was accordingly selected on that day, but the case was then adjourned until the following Monday, counsel advising that he would then be ready to make his opening statement to the jury.

dictably disastrous. Faced with a group of strangers and subjected without preparation to cross-examination about three year old professional activity, defendant reacted as almost any normal human being would. Having had no chance meaningfully to refresh his recollection, he took refuge in the unprepared layman's haven of "I don't remember", claiming to be able to add nothing to the records themselves.[5] In light of the dramatic nature of the accident and of the injuries, this appeared to be an absurd position. Plaintiff was thus able to represent defendant doctor at trial as some sort of ogre who had been satisfied with going through the forms of medical care without the slightest concern for the welfare of his patient. The carrier had not, of course, made any attempt to present the defendant doctor's view of the case by taking its own deposition of the defendant.

Not only did the carrier fail to present any testimony by the doctor stating his view of the facts, but it offered none from any of the professional or para-professional hospital personnel who had worked with him in the emergency room. Consequently, there was absolutely no medical testimony as to the critical nature of the condition with which defendant doctor was confronted when he first undertook to care for plaintiff. The jury's earliest view of the plaintiff was after he had been admitted to the intensive care unit, by which time defendant doctor had apparently pulled him through his crisis and his condition had become stabilized.

Having thus failed to present any evidence as to the doctor's need to concentrate on saving plaintiff's life, the carrier predicated its defense almost exclusively on the proposition that the eye had been hopelessly lost before defendant encountered plaintiff. Two excellent witnesses were available to support this proposition, but the carrier had spent no time preparing either of them for trial. Their testimony therefore proved ineffective.

The first witness called on this subject was Kenneth Adams, M.D. the ophthalmologist to whom plaintiff had been referred upon his discharge from the Community Hospital and who had ultimately enucleated the eye. He was obviously a competent physician and his direct testimony was straightforward and persuasive. Basing his opinion in part upon his study of a government prepared pathological report and in part upon his own observations, he concluded that the eye had been irretrievably lost at the moment of impact.

However, in introducing this witness to the jury defense counsel advised them that he had spoken to him only "for two minutes" before putting him on the stand. Cross-examination had not long been in progress before the disastrous effect of this lack of preparation became apparent. It soon developed that Doctor Adams had made two previous statements which appeared to be diametrically opposed to his conclusion that the eye had been destroyed at the moment of impact. In the hospital record made at the time of the enucleation he had noted:

"This eye was . . . not reparable being a one week old wound before the eye was ever seen." (Exhibit 1 A–B, see Tr. 62)

In a letter to plaintiff's counsel he had written:

"I do not know the condition of the eye at the time of the accident as I did not see him until 6/22/73. Had there been no retinal prolapse, no signs of infection, et cetera, then perhaps the prognosis would have been better. But this is only conjecture. Certainly the fact that the wound was open for five days before being considered did not help his prognosis." (Tr. 64)

Having observed Doctor Adams on the witness stand we are satisfied that he was confident of his ultimate opinion that plaintiff's eye had been destroyed at the moment of impact and that, had defense counsel

---

5. That he in fact did have recollection which could have been meaningfully refreshed is apparent from his testimony concerning conver-

sations with the consulting ophthalmologist, which conversations were not reflected in any records (Tr. 281–2).

taken the time and trouble to sit down and talk to him before putting him on the stand, he and counsel could have devised appropriate methods for making this confidence clear to the jury.[6] However, having been totally unprepared, he gave unconvincing explanations on cross-examination. On re-direct, having no idea how the witness would answer any particular question, defense counsel floundered around and made matters worse (see e. g. Tr. 65, lines 2–7). The net result was that this crucial witness was largely destroyed in the eyes of the jury.

The second witness on this subject, Herbert Gould, M.D., was called as an expert. Like Doctor Adams he gave clear and convincing opinion testimony to the effect that plaintiff's eye had been irretrievably destroyed at the moment of impact. However on cross-examination he readily conceded that if this view were correct it would necessarily follow that the eye would have been wholly without sight from the moment of impact (or very shortly thereafter). That concession having been established, the doctor was confronted with the following testimony (about which defense counsel had afforded him no warning whatsoever) that had been given by a friend of plaintiff's who had visited him in the hospital some days after the accident (Tr. 255, lines 7–25):

"A  Three days before he left from the hospital, I went to the room and I saw a nurse take the patch off his right eye and I make a little test. I don't know nothing about eye but I want to ask him because I was scared, you know.

So I ask Victor if, 'Do yourself a favor, I would like to see if you can see with your eye, the right eye.'

Q  What happened?

A  I raised my hand and says, 'Will you close your left eye and look and see if you see anything here?'

He says, 'I hardly see.'

I said, 'You see my hand?'

And he says, 'Yes.'

And I ask him 'What you see in my hand?'

And he says, 'I see you but it's hard.'

I said, 'Anything in my hand;  you see my fingers?'

And he said, 'No, but I see your hand.' "

In the real world the quoted testimony is quite meaningless and, had Dr. Gould been told of its existence, he could easily have explained why the jury should disregard it.[7] However, having been caught unaware and not even having been advised of the exact nature of the prior testimony, the doctor rather unconvincingly improvised (Tr. 433–4). In consequence, the jury were left with the impression that the evidence before them established facts inconsistent with those upon which the doctor had based his opinion.[8]

---

**6.**  We, obviously having had no opportunity to sit down with Dr. Adams and explore his thinking, are in no better position than was defense counsel to suggest how the doctor would have most comfortably dealt with the apparently inconsistent statements. We do note, however, that he had made the hospital entry before having had an opportunity to study the government's pathological report, and that the letter to plaintiff's attorney seems to have been his idea of how to refuse to testify on plaintiff's behalf without giving offense.

**7.**  A person suffering from an eye injury is utterly incapable of self-administering a test of the type described. Such a person would so intensely desire reassurance that sight had not been lost that he would inevitably "cheat", letting some light into the eye supposedly closed and attributing the resulting vision to the eye supposedly being tested. (Compare Dr. Gould's improvised explanation, Tr. 433–4).

**8.**  The jury were therefore entitled to find that at the moment defendant doctor undertook responsibility for plaintiff's care the eye was salvageable and would have responded to appropriate treatment. Having made that basic finding of fact, the jury would have been fully justified in concluding that the treatment actually afforded was grossly—and even wantonly—insufficient. Thus, they could well have concluded that the defendant doctor's deposition claims not to remember anything about his first encounter with plaintiff were untrue, and would have been justified in finding that he was deliberately lying to conceal his own negligence. Moreover, as we have noted, (apparently because defendant doctor had correctly

■ In short, it seems apparent that the jury's verdict had no other cause but the carrier's neglect. Since the carrier is in the business of defending lawsuits, it must be presumed to know the necessary ingredients of a proper defense. We therefore can only conclude that the above described neglect was a function of the carrier's deliberate decision not to spend enough money to have this lawsuit properly defended. Without any regard to its obligation to its assured—or to the court [9]—it apparently made a calculated decision to try this case "off the papers." Presumably it has concluded that by taking all its assured risks as a package it saves money in the end by skimping on preparation costs and hoping for settlements.[10] But whatever its motives, the record before us makes clear that the carrier deliberately decided not to spend the funds necessary to give this particular assured the semblance of a defense. We therefore conclude that the default was willful.

## II

## THE CONSEQUENCES OF THE CARRIER'S WILLFUL DEFAULT ON ITS ATTACK ON THE JURY'S FINDING OF LIABILITY.

As above noted defendant makes two contentions in support of the argument that the jury's finding of liability should be set aside and a new trial granted: (1) that such finding should be set aside in the court's discretion to avoid a miscarriage of justice and (2) that it resulted in part from an error in the admission of evidence. The resolution of both these contentions is affected by our finding that the carrier was guilty of willful neglect.

(1) The claim that the finding of liability should be set aside in the court's discretion.

We are told in Wright and Miller, Federal Practice and Procedure (Vol. II, § 2806 pp. 43–45) that:

" . . . the granting of a new trial on the ground that the verdict is against the weight of the evidence 'involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the system itself.' "

See also 6A Moore's Federal Practice § 59.-08[5]. The court being satisfied that under the facts as they actually exist (as opposed to those appearing in the record before us) the finding of liability is unwarranted, we would in ordinary circumstances have no hesitancy in setting it aside in the exercise of our discretion. However, in the instant situation defendant doctor is in no substantial way affected by the verdict. Its bur-

---

diagnosed the eye as unsaveable) nothing of any consequence was done by way of trying to save it. For example, there was considerable medical testimony to the effect that pressure placed on the injured eye by movements of the uninjured one might well have contributed to—if not actually caused—the ultimate loss of the former. The defendant doctor did not even take the elementary precaution of guarding against such pressure by putting a patch over the uninjured eye and thus immobilizing it.

9. We take judicial notice that the attorneys representing the defendant doctor in this court were full-time employees of the carrier. Whether such representation of a third party by full-time employees of a corporation should be deemed to constitute illegal practice of law by such corporation—a subject upon which we express no opinion—it certainly makes the corporate employer responsible for its employees' default in their duty to the court.

10. It has been suggested in some quarters that the sloppy conduct characteristic of some (but not all) carriers is due to the fact that money spent in defending a case is unrecoverable by them, but that money paid to a plaintiff is indirectly recoverable in that it is taken into account in the calculation of future premium rates. We have no way of evaluating the merits of such suggestion, but shall send a copy of this opinion to the New York Department of Insurance to the end that it may evaluate the situation and take whatever remedial steps it may deem appropriate. [Subsequent to the filing of this opinion we received advice from the office of the General Counsel to the New York State Department of Insurance to the effect that the above speculation is unfounded in that, pursuant to § 183(1)(d) of the New York State Insurance Law, legal expenses incurred in defending claims are includable in the rate base].

den falls exclusively upon the carrier whose willful neglect brought it about.[11] This raises the question whether an insurance carrier may deliberately neglect to prepare a case for trial and then, if the verdict is unfavorable, call upon the court to set it aside. We think not.

■■■ The purpose of a court's discretionary power to grant a new trial is to prevent a "miscarriage of justice." *Compton v. Luckenbach Overseas Corp.* (2d Cir. 1970) 425 F.2d 1130, 1133, *cert. denied* (1970) 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155. 6A Moore's Federal Practice (2d ed. 1976) ¶ 59.08[5] at 59–160. There cannot, in our view, be such a miscarriage where the individual defendant is not being injured but his insurance carrier is simply being called upon to suffer the consequences of its own willful neglect. We accordingly decline to exercise our discretion on the carrier's behalf.

(2) The claim that there was an error in the admission of evidence.

As we have noted (footnote 8, *supra*), it was clear from the evidence that plaintiff's eye received only minimal attention from defendant doctor. Indeed the attention was so cursory as to suggest that it had been the doctor's professional judgment that the eye had at all times been beyond saving. In an apparent [12] effort to rebut this suggestion, plaintiff offered in evidence certain disability applications the doctor had filed with several insurance companies claiming he was no longer able to practice medicine because he had become subject to recurrent spells of blindness. These applications fixed the onset of this condition at June 15, 1972, some twelve months before he treated plaintiff (Tr. 237–40).

Plaintiff argued in summation that this evidence established that defendant doctor's neglect of the eye had resulted from his own infirmities rather than from any proper professional judgment.

■■■ The documents were clearly relevant to support this argument. The only valid ground of objection to this evidence would appear to be that its prejudicial effect might outweigh its probative value. However, prejudice would have arisen principally from the fact that the defendant doctor in his deposition had falsely denied the existence of these applications, and had made no attempt to explain them. Unless these deposition falsehoods were deliberate (in which event no one would now be in a position to complain), they were a product of the carrier's willful neglect in having failed to prepare defendant for his deposition. For the reasons already indicated, the carrier cannot now obtain relief from the consequences of such willful neglect.

### III

### THE CLAIM THAT THE VERDICT IS EXCESSIVE

For the purpose of assessing this claim, we necessarily proceed on the assumption that the jury was fully justified in its finding of liability. The carrier's neglect is not a factor in our consideration of the question of damages (except to the extent that a properly prepared defense might have given the jury a wholly different picture of the damages sustained).

Ordinarily a jury's resolution of the question of damages will not be disturbed unless there is reason to believe that it was the

---

11. The parties have stipulated that defendant doctor's insurance policy fully covers the verdict. Moreover, having permanently retired from the practice of medicine and having taken up residence in Texas, the doctor is not harmed by any effect this verdict may have on future premium rates and is in no substantial way affected by possible injury to his professional reputation. Moreover, to the extent that de-

fendant doctor may have been indirectly injured by the verdict, it would seem that he has a clear action for malpractice against the carrier (cf. n. 9, supra).

12. We use the word "apparent" because when the evidence was offered neither party was particularly articulate as to the purpose of the offer or of the grounds of objection.

result of passion, bias or prejudice, or that it is so excessive as to shock the conscience of the court, 6A Moore's Federal Practice (2d ed. 1976) ¶ 59.05[3] at 59–53 and ¶ 59.-08[6] at 59–169. In our view neither of these criteria are here met.

■ As to the first criterion, the jury gave no indication that they acted out of prejudice or passion. On the contrary, they deliberated for four and a quarter hours, their deliberations having been interrupted by overnight and luncheon recesses. Moreover, questions asked during these deliberations clearly indicated that the jury were carefully following the court's instructions to deal with the question of liability before concerning themselves with damages.

With respect to the second criterion, the plaintiff had made claims for lost earnings and for pain and suffering. On the question of lost earnings the jury had before it the uncontradicted testimony of a psychiatrist that plaintiff was permanently disabled,[13] a stipulated life expectancy of thirty-four years and evidence suggesting that plaintiff had been earning at the rate of approximately $11,000 per year just before the accident.[14] Even if it were to be assumed that this young man would not have increased his earning power over the years to come, this would have justified a total estimate of $374,000 (which, of course, the jury was instructed to discount) over the stipulated life expectancy.[15]

■ With respect to pain and suffering, the jury were entitled to accept the uncontradicted psychiatric testimony that plaintiff had fully recovered from all other injuries received in the accident, and that the loss of the eye was solely responsible for turning him from a buoyant and promising athlete into a suicide-prone recluse who would forever be incapable of enjoying any human companionship, male or female.[16] In other words, the jury were entitled to accept the psychiatrist's uncontradicted prediction that the plaintiff was fated to a life (thirty-four years according to the stipulated expectancy) of unrelieved misery. We find no basis for concluding that the psychiatrist's testimony was not given in good faith. We therefore decline to place any arbitrary limit on the damages the jury could have allocated for pain and suffering.[17] Cf. *Tinnerholm v. Parke, Davis & Co.* (2d Cir. 1969) 411 F.2d 48, 55; *Yarrow v. United States* (S.D.N.Y.1970) 309 F.Supp. 922, 932; James, Remedies for Excessiveness or Inadequacy of Verdicts, (1963) 1 *Duquesne L.Rev.* 143, 146. We accordingly do not find the damages awarded to be so grossly excessive as to shock the conscience of the court.

In short, we reject as unfounded all attacks on the jury's verdict, and in all re-

---

**13.** This is not a situation where the defendant offered and the court excluded testimony which would have called the expert's opinion into question and tended to establish that the plaintiff was in fact employable. Cf. *Rapisardi v. United Fruit Co.* (2d Cir. 1971) 441 F.2d 1308.

**14.** The evidence as to plaintiff's rate of earnings is confusing, but the court, without objection by either party, gave $11,000 as a figure upon which counsel had agreed (Tr. 488).

**15.** In view of plaintiff's testimony that he had been offered (and because of his disability had been unable to accept) a job coaching in professional soccer (Tr. 361), the court perhaps committed error in favor of defendant in excluding from the jury's consideration possible professional sports earnings (Charge, Tr. 489).

**16.** The expert so testifying was Dr. Bernard Kalina, a psychiatrist. His testimony was based in part upon statements made to him by plaintiff in the course of psychiatric examinations. Although conceding that Rule 803(4) of the new Federal Rules of Evidence authorizes the receipt of such statements, defendant now cites seven cases for the proposition that they should have been excluded in the exercise of discretion (Defendant's Post-trial Memorandum, pp. 15–17). We simply note that Dr. Kalina's entire direct testimony went into evidence without objection of any kind (Tr. 373–78).

**17.** We did not charge the jury that they should discount any damages awarded for future pain and suffering. Cf. *Chiarello v. Domenico Bus Service, Inc.* (2d Cir. 1976) 542 F.2d 883, 886. However, we were not requested so to charge, and no objection was made to our failure to do so.

spects deny the motions made by defendant doctor.

SO ORDERED.

### ADDENDUM

Because of the possibly controversial nature of our opinion, we circulated it as a "proposed opinion" among counsel in advance of its filing, and invited written comment. The carrier responded through a letter and memorandum of counsel. We have caused that letter and memorandum to be filed. They do not persuade us of error.

The carrier's response proceeds on the theory that we had found the evidence insufficient to support the verdict. Our holding was precisely to the contrary. Thus, in n. 2, *supra*, we observed:

"Defendant also moves for a judgment notwithstanding the verdict and dismissal of the complaint on the ground that the verdict is unsupported by any evidence. We deem this motion to be frivolous."

Our opinion may briefly be summarized: having held as a matter of law that the evidence was sufficient to support the verdict, we indicated that had the finding of facts been within our province we should have found for defendant rather than for plaintiff. We then addressed ourselves to the question whether we should exercise our equitable powers to give defendant a second chance. In considering that question we found the carrier—and not defendant doctor—to be the real party in interest, and concluded that its willful failure to prepare for the trial which had been afforded left it without equitable standing to demand another.[18]

We stress that the most we could have done was to order another jury trial and that, contrary to the carrier's apparent impression, there is no assurance a second jury would come to any different conclusion than did the first. Nor is there anything

writ in Heaven to say that our view of the facts—rather than the jury's—is the correct one. While we concluded that counsel's failure to prepare defendant doctor for his deposition prevented him from advancing a valid defense, it is entirely possible (and a second jury might well find) that such lack of preparation resulted in the emergence rather than the perversion of truth. Similarly, a second jury might well conclude (and perhaps correctly) that defendant doctor's false denial of the disability applications was intended to conceal the fact that he had actually suffered a seizure of blindness while treating plaintiff. Finally, with respect to our preference of defendant's expert ophthalmologists over plaintiff's, the appraisal of expert testimony is certainly a matter within the jury's province. *Manning v. New York Telephone Co.* (2d Cir. 1968) 388 F.2d 910, 912; *Wong Ho v. Dulles* (9th Cir. 1958) 261 F.2d 456, 460.

In brief, although we adhere to the factual views expressed in our opinion, there can be no gainsaying that the jury could properly have come to the opposite conclusion. We simply rule that a judgment notwithstanding the verdict is not warranted as a matter of law and that, as to the motion for a new trial, the carrier's willful default disentitles it to call upon our discretion to afford it a second chance.

---

18. It is noteworthy that, while complaining of the result, the carrier offers no challenge to the analysis of the evidence upon which we based our conclusion that it indeed had been in willful default. By way of contrast, the opinion as originally circulated contained two sections critical of the conduct of plaintiff's attorney. By appropriate affidavit such attorney advised us of facts which persuaded us that those sections were unjustified. They have been withdrawn.