Irving **MACHLEDER** and **Flexcraft Industries, Inc., Plaintiffs,**

v.

Arnold **DIAZ, CBS Inc., WCBS–TV, Ann Sorkowitz, Frank Pivalo, Thomas Gallagher, and Dennis P. Coyne, Defendants.**

No. 79 Civ. 4373 (PKL).

United States District Court,
S.D. New York.

Oct. 4, 1985.

Wien, Malkin & Bettex, New York City, Robert A. Machleder, of counsel, for plaintiffs.

Patterson, Belknap, Webb & Tyler, New York City, Harold R. Tyler, Jr., of counsel, Coudert Brothers, New York City, Pamela Ostrager, of counsel, Ronald E. Guttman, Associate Gen. Counsel, New York City, for defendants.

## DECISION

LEISURE, District Judge:

The complaint in this diversity action asserted claims for compensatory and punitive damages for libel, slander, invasion of privacy, trespass and assault and battery. The claims arose out of the May 22, 1979 broadcast by WCBS–TV of a report about the dumping of chemical wastes on a certain lot adjacent to Avenue P in Newark, New Jersey. The report was prepared by Arnold Diaz, the station's New Jersey reporter.

Applying New Jersey law, Judge Duffy dismissed two of the three invasion of privacy claims and the trespass claim upon defendants' summary judgment motion. *Machleder v. Diaz*, 538 F.Supp. 1364 (S.D. N.Y.1982). Pursuant to defendants' application, the trial of this case was bifurcated between the issues of liability and damages. After the close of evidence on the liability issues, the Court granted defendants' motion to dismiss the assault and battery claims pursuant to Fed.R.Civ.P. 50(a). Following the completion of the trial on both the liability and damages issues, the jury returned a verdict in favor of all defendants on the libel and slander claims but with respect to plaintiff Irving Machleder's false light invasion of privacy claim, it awarded him $250,000 in compensatory damages and $1,000,000 in punitive damages against defendant CBS, Inc. ("CBS") only.

CBS has now moved for an order granting judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b), or in the alternative, an order granting a new trial under Rule 59(b). Plaintiffs have cross-moved under Fed.R.Civ.P. 11, 16(f), 26(g), 37(b)(2)(D) and 56(g) for an order imposing sanctions and reasonable costs and attorney's fees against CBS and its counsel in connection with the discovery of the videotape of the on-air broadcast of the May 22, 1979 report, and the affidavit signed by Mr. Diaz and submitted to the Court in connection with defendants' summary judgment motion.

### Defendant's Post-Trial Motions

Six of the arguments raised by CBS in support of its post-trial motions were the basis for objections raised unsuccessfully at trial.[1] The six arguments, summarized

---

[1]. In addition to preserving objections previously made as to evidence which it contends was admitted incorrectly and the sufficiency of proof offered at trial, as well as objections to portions of the Court's jury instructions, CBS reiterated the following specific arguments:

 1. The admission into evidence of a redacted transcript of "Watching the Watchdog" was erroneous and rendered the trial fundamentally unfair.

 2. The jury's finding of no falsity with respect to plaintiffs' libel claim renders the proof of Mr. Machleder's false light invasion of privacy claim insufficient as a matter of law.

 3. The lack of falsity in the broadcast renders Mr. Machleder's false light invasion of privacy claim insufficient as a matter of law.

 4. Mr. Machleder's proof under his false light invasion of privacy claim falls below that required to establish *New York Times* actual malice.

 5. Mr. Machleder's punitive damages claim should not have been submitted to the jury because there was no proof supporting a finding of common law malice.

 6. The Court's failure to instruct the jury that there is no right to avoid being filmed or appearing on television was prejudicial to CBS in light of the manner in which plaintiffs' presented their case at trial.

Memorandum of Law in Support of Post-Verdict Motions by Defendant CBS Inc., at 1–3.

in the margin, are hereby denied for the reasons previously stated by the Court on the record during the trial, with the exception of the argument that plaintiff can recover punitive damages only if he proves common law malice. That subject is treated more fully below.

The thrust of CBS's post-trial motions is directed to the jury's damage awards. CBS alleges that these awards have no foundation in the law or under the facts of this case. More specifically, CBS argues that there was insufficient evidence from which the jury could determine that Mr. Machleder suffered actual injury as a result of the May 22, 1979 broadcast. Next, assuming that plaintiff Machleder[2] proved actual injury, CBS contends that the amount of the award is excessive. Finally, CBS argues that the punitive damages award is unsupported by the record and is grossly excessive.

*Compensatory Damages*

The standard for determining whether to grant a motion for judgment notwithstanding the verdict was set forth by the Second Circuit in *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163 (2d Cir. 1980).

> [T]he trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.* at 168. *See also Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 825 (2d Cir.1984).

In cases such as this where First Amendment considerations apply, the Supreme Court requires that "compensatory awards 'be supported by competent evidence concerning the injury.'" *Time, Inc. v. Fire-stone,* 424 U.S. 448, 459, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976) quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). Under New Jersey law, a plaintiff may recover compensatory damages "if he has met his burden of proving that he has suffered some loss or injury and if he has given the jury some information from which to estimate the amount of damages...." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1226 n. 1 (1984).

The false light invasion of privacy tort "is designed to compensate for falsehoods that injure feelings rather than reputation." Sack, *Libel, Slander and Related Problems,* 393 (1980). "The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute that that caused by bodily injury." *Clark v. Celeb Publishing, Inc.,* 530 F.Supp. 979, 983 (S.D. N.Y.1981) (California law) (quotation omitted).

CBS argues that the trial transcript is devoid of evidence supporting the jury's compensatory damage award. After describing encounters with five people who told him that they had seen the broadcast, the following question was asked of Mr. Machleder and he gave the following answer:

Q: How did you feel when these people mentioned the broadcast to you?

A: Terribly embarrassed, terribly hurt. Trial Transcript at 1131–32. CBS contends that this testimony constitutes the only evidence presented by plaintiff which describes the mental anguish he suffered as a result of the broadcast and does not amount to adequate proof of injury to feelings. *See, e.g., Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 141 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Reveley v. Berg Publications, Inc.,* 601 F.Supp. 44, 46 (W.D.Tex.1984); *Nekolny v. Painter,* 653

---

**2.** For the sake of convenience, Mr. Machleder is hereinafter referred to as "plaintiff," in the singular.

F.2d 1164, 1172–73 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Nellis v. Miller*, 101 A.D.2d 1002, 477 N.Y.S.2d 72, 73 (4th Dep't), *appeal dismissed*, 63 N.Y.2d 952 (1984). In other words, CBS contends that plaintiff has offered no evidence of the nature, duration or seriousness of his mental anguish nor what effect, if any, the broadcast had on the quality of his life. *See, Bullard v. Central Vermont Ry.*, 565 F.2d 193, 197 (1st Cir.1977). Consequently, the compensatory award must have been based on "conjecture, speculation, surmise or guess." *Knapp v. Phillips Petroleum Co.*, 123 N.J.Super. 26, 31, 301 A.2d 451, 453 (App.Div.), *certif. denied*, 63 N.J. 503, 308 A.2d 668 (1973).

■ The argument that the exchange quoted above is the only evidence of plaintiff's hurt feelings is misleading. CBS ignores plaintiff's testimony about his apprehension that the broadcast would portray him as an illegal dumper, his frantic efforts to prevent the New Jersey footage from being broadcast and his concern that the story would damage the careers of his sons who worked in the chemical industry. In addition, it is self-evident from a viewing of the broadcast tape itself that Mr. Machleder was very upset at even the suggestion that he was somehow responsible for the barrels strewn about the lot next to the Flexcraft Industries, Inc. factory. Further, the CBS legal counsel who spoke to Mr. Machleder when plaintiff asked that the report not be broadcast testified that plaintiff was "rather agitated" at that time. While it is true that some of this testimony related to events which occurred before the report was broadcast, there is no evidence in the record to indicate that Mr. Machleder's mental state improved after the broadcast. Indeed, it is a fair inference that his fears, apprehension and anguish intensified once people started telling him that they had seen the report, as reflected in his testimony at trial.

More important, however, CBS has ignored the demeanor aspect of Mr. Machleder's testimony. The testimony that is coldly recorded in the trial transcript is stripped of the dramatic emotional manner in which it was delivered. Plaintiff's testimony was emotion-filled and more than once his voice wavered and he broke into tears. This aspect of his testimony undoubtedly impressed the jury and certainly impressed the Court that defendant's broadcast had had a genuine and profound impact on Mr. Machleder's mental condition. The fact that his torment has persisted over the intervening six years is evidence of the depth and scope of his hurt feelings.

■ CBS has cited several cases for the proposition that substantial compensatory awards for mental distress are improper where the only evidence is subjective. This argument is unavailing, not only because there was objective evidence to prove plaintiff's injuries, but plaintiff's conduct was competent evidence to prove such damage. "Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others." *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 1052 n. 20, 55 L.Ed.2d 252 (1978). The jury's ability "to hear and see the witnesses and to have the 'feel' of the case" is a significant factor for the Court to consider on this motion. *Cf. State v. Johnson*, 42 N.J. 146, 199 A.2d 809, 817 (1964). In addition, evidence that plaintiff had anxiety over the effect the broadcast might have on his sons is "competent evidence ... to permit the jury to assess the amount of injury." *Time, Inc. v. Firestone*, 424 U.S. 448, 460–61, 96 S.Ct. 958, 968–69, 47 L.Ed.2d 154 (1976) (plaintiff testified that she feared her son would be adversely affected by the story). Moreover, medical evidence is not required to demonstrate mental anguish sufficient to permit the recovery of damages. *Cf. Wiskotoni v. Michigan National Bank-West*, 716 F.2d 378, 389 (6th Cir.1983); *Burnett v. National Enquirer, Inc.*, 7 Media L.Rep. (BNA) 1321, 1323 (Cal.Super.1981), *aff'd in relevant part*, 144 Cal.App.3d 991, 193 Cal. Rptr. 206 (1983), *appeal dismissed*, 465 U.S. 1014, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984).

CBS has failed to demonstrate that the jury's verdict could only have been the result of "sheer surmise and conjecture" or that there was such overwhelming evidence in favor of CBS that reasonable men could not arrive at a verdict against CBS. *Mattivi*, 618 F.2d at 168. Defendant's motion to set aside the verdict or for a new trial on the basis that plaintiff failed to prove that he suffered actual injury is denied.

■ CBS argues next that, even assuming plaintiff has proved an actual injury, the jury's compensatory award was grossly excessive. On such a motion, the Court should not disturb the jury's damages verdict unless there is reason to believe the verdict was the result of passion, bias or prejudice or that it is so excessive or shocking to the court's conscience "that it would be a denial of justice to permit it to stand." *Mileski v. Long Island Railroad Co.*, 499 F.2d 1169, 1173 (2d Cir.1974); *Morgan v. Consolidated Rail Corp.*, 509 F.Supp. 281, 286 (S.D.N.Y.1980); *Bevevino v. Saydjari*, 76 F.R.D. 88, 94–95 (S.D.N.Y.1977), *aff'd*, 574 F.2d 676 (2d Cir.1978).

■ The first criterion is not met here. There is no indication the jury acted out of prejudice or passion. First, the trial was bifurcated so the jury would deliberate on the issues of liability and damages separately. The jury deliberated three days on the liability issues and devoted an additional half-day to the damages deliberations. It requested and received copies of selected portions of the trial transcript and received a copy of the Court's instructions on liability and damages. The jury rejected two of the theories of liability alleged by plaintiffs. The jury's conduct in this regard demonstrates that it carefully and deliberately followed the Court's instructions and

was not influenced by passion or prejudice. *Porss v. Maritime Overseas Corp.*, 531 F.2d 667, 669 (2d Cir.1976) (testimony read and two of plaintiff's claims rejected); *La France v. New York, New Haven & Hartford Railroad Co.*, 191 F.Supp. 164 (D.Conn.), *aff'd*, 292 F.2d 649 (2d Cir.1961).

When considering a claim of excessive damages the Court must accord the jury's verdict "substantial deference." *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740, 750 (2d Cir.1984). In order to determine whether an award is so excessive as to shock the judicial conscience, the Court should look to other cases involving awards for mental anguish which were reviewed by higher courts. *Id.* CBS has referred the Court to several decisions where compensatory damage awards in excess of $50,000 were reduced by means of remittitur or reversed altogether.[3]

A review of these cases, while they do make the Court aware of judicial attitudes in general, "is not particularly helpful since the facts of each case vary significantly." *Burnett v. National Enquirer*, 7 Med.L. Rep. (BNA) at 1323. *See also Dagnello v. Long Island Railroad*, 193 F.Supp. 552, 554 (S.D.N.Y.1960) (Weinfeld, J.) (review of cases "emphasize[s] contrariety of individual views"), *aff'd*, 289 F.2d 797 (2d Cir.1961). In addition, there are cases where jury verdicts in excess of $50,000 have been left undisturbed. *Time, Inc. v. Firestone*, 424 U.S. at 460–61, 96 S.Ct. at 968–69 ($100,000 jury award); *Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084, 1093–94 (5th Cir.1984) ($150,000 jury award for false light invasion of privacy), *cert. denied*, — U.S. —, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985); *cf. Alioto v. Cowles Communications, Inc.*,

**3.** *Pirre v. Printing Develop., Inc.*, 468 F.Supp. 1028, 1038 (S.D.N.Y.), *aff'd*, 614 F.2d 1290 (2d Cir.1979) ($325,000 jury award reduced to $45,000); *Nellis v. Miller*, 101 A.D.2d 1002, 477 N.Y. S.2d 72, 73 (4th Dep't), *appeal dismissed*, 63 N.Y.2d 952 (1984) ($150,000 jury award reduced to $5,000); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 141 (2d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) ($7,000,000 jury award reversed); *Nev. Indep. Broad. Corp. v. Allen*, 99 Nev. 404, 664 P.2d 337,

347 (1983) ($675,000 jury award reduced to $50,000); *Burnett v. Nat'l Enquirer, Inc.*, 7 Media L.Rep. (BNA) 1321, 1323–24 (Cal.Super. 1981) ($300,000 jury award reduced to $50,000), *aff'd in relevant part*, 144 Cal.App.3d 991, 1016, 193 Cal.Rptr. 206, 222 (1983), *appeal dismissed*, 465 U.S. 1014, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984); *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1144–45 (7th Cir.1985) ($300,000 jury award reversed).

430 F.Supp. 1363, 1372 (N.D.Cal.1977) ($350,000 jury award based in part upon plaintiff's uncontradicted testimony "to the apprehension and severe mental and emotional distress ... caused"), aff'd, 623 F.2d 616 (9th Cir.1980), cert. denied, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981). Based upon a careful review of these cases and those cited by CBS, as well as the facts and circumstances of this case, the jury's compensatory damages award of $250,000 is neither excessive nor outrageous. CBS' motion to reduce the jury's compensatory damage verdict is denied. ·

### Punitive Damages

CBS asks the Court to set aside the punitive damage verdict because the amount of the award is so excessive that it shocks the judicial conscience. In addition, CBS has renewed its motion that plaintiff is not entitled to a punitive damage award because he failed to prove that CBS acted with spite or ill will.

### Common Law or Actual Malice?

■ In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974), the Supreme

Court held that that the First Amendment prohibited punitive damage awards against the publisher of a libel that involved a matter of public concern unless plaintiff proved "actual malice," that is knowledge of falsity or reckless disregard for the truth. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, — U.S. —, 105 S.Ct. 2939, 2941, 86 L.Ed.2d 593 (1985). Although the *Gertz* decision did not bar states from imposing further restrictions on the imposition of punitive damages, most state and federal courts have adopted the actual malice standard as the only requirement in this regard for a punitive damage award. Note, *Punitive Damages and Libel Law*, 98 Harv.L.Rev. 847, 847, 854 & n. 42 (1985). *See, e.g., Goldwater v. Ginzburg*, 414 F.2d 324, 343 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). Defendant's argument in this regard raises the question whether under New Jersey law proof of *New York Times* actual malice will support an award of punitive damages or whether plaintiff also must separately prove common law malice.[4]

---

**4.** Over plaintiffs' objection, the jury in this case was instructed to apply the *New York Times* actual malice standard to the issue of liability for false light invasion of privacy. This instruction was based on the authority of two opinions of the Supreme Court in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) and *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). In *Time, Inc. v. Hill*, a false light invasion of privacy action, the Court held that in order to establish liability plaintiff had to prove publication with knowledge of falsity or with reckless disregard of the truth. 385 U.S. at 388, 87 S.Ct. at 542. In *Cantrell*, also a false light invasion of privacy action, the Court declined "to consider whether a State may constitutionally apply a more relaxed standard of liability" in a false light invasion of privacy action brought by a private figure or "whether the constitutional standard announced in *Time, Inc. v. Hill*, applies to all false-light cases." 419 U.S. at 250–51, 95 S.Ct. at 469–70 citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See* Restatement (Second) of Torts § 652E comment d, at 398–99 (1977). Several courts have applied a negligence standard in actions involving a private figure plaintiff. *Wood v. Hustler Mag., Inc.*, 736 F.2d 1084 (5th Cir.1984), cert. denied, — U.S. —. 105 S.Ct. 783, 83 L.Ed.2d

777 (1985); *Dresbach v. Doubleday & Co.*, 518 F.Supp. 1285, 1288 (D.D.C.1981); *Fitzgerald v. Penthouse Int'l, Ltd.*, 639 F.2d 1076, 1080 (4th Cir.), on remand, 525 F.Supp. 585, 602–03 (D.Md.1981), aff'd in relevant part, 691 F.2d 666 (1982), cert. denied, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983); *Uhl v. Columbia Broadcasting Systems, Inc.*, 476 F.Supp. 1134, 1139–41 (W.D.Pa.1979); *Rinsley v. Brandt*, 446 F.Supp. 850, 856 (D.Kan.1977). One New Jersey intermediate appellate court has hinted that in a non-media case with a private figure plaintiff it may be appropriate to prove liability on a negligence standard. *Devlin v. Greiner*, 147 N.J.Super. 446, 371 A.2d 380 389 n. 4 (Law Div.1977). Also, one court has suggested that because the same considerations apply to claims for defamation and false light invasion of privacy, when both torts are alleged in one case, the same standard of fault should apply to both torts. *Cibenko v. Worth Pub. Inc.*, 510 F.Supp. 761, 766 (D.N.J.1981). *See also* Hill, *Defamation and Privacy Under The First Amendment*, 76 Col.L.Rev. 1205, 1274 & n. 321 (1976). Notwithstanding these considerations, in the absence of an explicit ruling on this issue by either the United States Supreme Court or the New Jersey Supreme Court, it is this Court's determination that the actual malice standard of liabili-

Constitutional "actual malice" and common law malice address different concerns. In *Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376, *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982), the New Jersey Supreme Court stated that " 'actual malice' does not mean that "the defamatory falsehood was published with ill will, but rather that the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " 445 A.2d at 388 quoting *New York Times Co. v. Sullivan*, 376 U.S. 254 at 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686.

New Jersey statutory law provides that in a libel action against a New Jersey media defendant, a plaintiff may recover punitive damages only if he proves either malice in fact or that, in the face of a written demand, the defendant refused to publish a retraction within a reasonable time. N.J. Stat.Ann. § 2A–43–2 (West 1952 & Supp. 1985). In this regard, the parties stipulated that plaintiffs demanded a retraction in writing and that defendants did not retract as requested in the letter. On this basis alone, the evidence established one of the elements under New Jersey law entitling a libel plaintiff suing a media defendant to recover punitive damages. It is not clear to the Court, however, whether this statute applies in this case. Neither party has referred to it and application of the statute by its terms is limited to libel actions against New Jersey defendants. It does not on its face appear to apply to false light invasion of privacy claims. But, there are other reasons to hold that plaintiff was entitled to have the jury consider the punitive damages issue.

It is true, as CBS argues, that under some circumstances New Jersey courts have required a plaintiff seeking punitive damages in a libel case to prove some type of spite or ill will. *See, e.g., Marchiano v. Sandman*, 178 N.J.Super. 171, 428 A.2d 541, 543 (App.Div.), *certif. denied*, 87 N.J.

392, 434 A.2d 1073 (1981); *Sisler v. Courier-News Co.*, 199 N.J.Super. 307, 489 A.2d 704, 715 (App.Div.1985) (negligence standard applied in private figure libel suit). But other decisions indicate that in libel cases an evil motive is not an absolute requirement. For example, in *Bock v. Plainfield Courier-News*, 45 N.J.Super. 302, 132 A.2d 523 (App.Div.1957) the court held that a plaintiff may be entitled to punitive damages "though the proof fails to disclose a designedly evil intent, it suggests a calculated disregard of the consequences." 132 A.2d at 529.

The language used by New Jersey courts to define the type of conduct that would justify an award of punitive damages lends credence to the argument that knowing or reckless falsity may encompass elements of ill will. *See e.g.*, Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1441 (1975) (hereinafter "Eaton") ("Publication of a known lie or publication with a high degree of awareness of probable falsity does seem to carry all the indicia of a bad attitude toward the plaintiff's reputational interest."). In *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d 1224 (1984), the New Jersey Supreme Court decided whether punitive damages may be awarded in the absence of a compensatory damage award in an action for legal fraud. *Id.*, 477 A.2d at 1226. The court reviewed the New Jersey law concerning punitive damages and concluded that "punitive damages could be awarded for egregious conduct in the absence of compensatory damages." *Id.* at 1231. The court began its analysis by stating that punitive damages may be awarded if the defendant's conduct was "wantonly reckless or malicious." The court defined those terms in several different ways. It stated that plaintiff must show there was "a wanton and wilful disregard of the rights of

---

ty applies to the false light invasion of privacy claim in this action. *Accord McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 888 (Ky.1981), *cert. denied*, 456 U.S. 975, 102

S.Ct. 2239, 72 L.Ed.2d 849 (1982); *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840, & n. 9 (1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980).

another," *id.* at 1230, that "there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences," *id.,* or "such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton." *Id.* at 1231 (quotation omitted).

The United States Supreme Court's use of the term "actual malice" has spawned confusion among state courts attempting to reconcile common law definitions of malice with federal constitutional requirements. *See* Eaton, 61 Va.L.Rev. at 1371. This situation has led the New Jersey Supreme Court to observe "that superimposing the federal standard on existing state standards would add one more complexity to the 'confusion of libel and slander law.'" *Burke v. Deiner,* 97 N.J. 465, 479 A.2d 393, 399 (1984) (citation omitted). As a consequence, the court adopted the *New York Times* actual malice standard to determine whether the qualified immunity that attaches to official speech applied. 479 A.2d at 399.

In addition, because the jury had awarded plaintiff punitive damages, the Court was constrained to hold further that "[t]he jury should be instructed to use this [knowledge of falsity or reckless disregard for the truth] standard as well to assess punitive damages." *Id.* at 400. n. 2. This determination was based on United States Supreme Court cases that had "uniformly emphasized that the jury is not to look for evidence of spite or ill will to judge the actor's speech." *Id.* at 399.

The central issue in *Burke v. Deiner* was whether government officials had a privilege with respect to an allegedly defamatory official statement. The case did not involve a false light invasion of privacy claim by a private party against a media defendant. Nevertheless, when the Court stated that the jury should be instructed to use the actual malice standard to assess punitive damages, it cited as authority *Embrey v. Holly,* 293 Md. 128, 442 A.2d 966, 972 n. 14 (1982) and *Davis v. Schuchat,* 510 F.2d 731, 737 (D.C.Cir.1975), two actions

brought by private persons against media defendants. The Court's reference to these cases, coupled with its discussion of the confusion attendant to superimposing federal standards on state standards, leads me to conclude that the New Jersey Supreme Court would require the jury to apply the actual malice standard when assessing punitive damages in a case such as this. I therefore hold that in this case, having found that CBS acted with actual malice, the jury properly considered the issue of punitive damages.

*Was the Award Excessive?*

■ In reviewing the award of $1,000,-000 for punitive damages, the Court must consider the circumstances surrounding the broadcast, the nature of the wrongdoing, the extent of the harm inflicted, the intent behind defendant's acts, defendant's wealth, "as well as any mitigating circumstances which may operate to reduce the amount of the damages." *Nappe,* 477 A.2d at 1231. New Jersey law does not require that the amount of punitive damages bear a fixed proportional relationship to the amount of actual damages. *Id.*

■ The evidence before the Court supports a substantial award of punitive damages. Defendant's conduct was shown to be callous and indifferent to the rights of plaintiff. CBS employees deliberately decided to broadcast the film of Mr. Machleder, despite a lack of evidence that he was responsible for the abandoned drums and despite knowledge that he had in fact reported their presence to local government agencies two years earlier. The evidence suggested the film was used in order to lend some excitement to an otherwise uneventful story. Serious questions existed whether plaintiff's reaction to the reporter and film crew was newsworthy.

■ One purpose of a punitive damages award is to deter future conduct of a similar nature. *See, Brink's Inc. v. City of New York,* 546 F.Supp. 403, 413 (S.D.N.Y. 1982) (Weinfeld, J.), *aff'd,* 717 F.2d 700 (2d Cir.1983). The evidence presented about the attitude of CBS employees toward the

handling of the broadcast indicates there is a likelihood that such activity will be repeated as part of a business policy. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130, 159–61, 87 S.Ct. 1975, 1993–95, 18 L.Ed.2d 1094 (1967); *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 402 N.Y.S.2d 815 (1st Dep't 1978).

Although there was no evidence presented to the jury proving the wealth possessed by CBS, paragraph three of the complaint alleged that in 1978 CBS had gross revenue in excess of $3 billion and net income in excess of $198 million. An award of $1,000,000 is an amount sufficient to "smart" and serve as notice to others that the type of practices at issue in this matter are not condoned by the community. CBS has argued in support of mitigation that it provided a public service by publicizing the hazard which existed and caused the drums to be disposed of properly. While these are certainly important factors in support of mitigation which could operate to reduce the amount of damages, these arguments were presented to the jury and necessarily considered by it in fixing the amount of the punitive damages award. I will not disturb the jury's verdict in this regard. The motion for judgment notwithstanding the verdict and for a new trial is denied.

### Plaintiffs' Motion for Sanctions

Plaintiffs base their motion for sanctions on two incidents. The first involved their attempts to obtain a copy of the videotape of the May 22, 1979 broadcast with studio comments. The second involves the affidavit signed by Mr. Diaz and submitted to the Court in connection with defendants' summary judgment motion.

### The Videotape With Studio Comments

 Plaintiffs' First Request for Production of Documents, dated October 16, 1979, requested all documents relating to the Diaz report as actually broadcast on May 22, 1979. Defendants did not object to the terms of plaintiffs' document request

and they agreed to produce for plaintiffs' inspection all documents that related to the Diaz report. However, the videotape of the complete on-air Diaz report with studio comments was not produced to plaintiffs' counsel for inspection.

By letter dated November 28, 1979, plaintiffs' counsel informed defendants' counsel that the recitation of the broadcast dialogue in paragraph 34 of the complaint was reproduced from a transcript that CBS had supplied to him. That transcript apparently had been prepared by an outside contractor hired by CBS. In response, Coudert Brothers advised plaintiffs' counsel that the videotape of the complete on-air broadcast with studio remarks did not exist.

Plaintiffs' Supplemental Request for Production, dated December 19, 1980, repeated verbatim the document request which encompassed the complete on-air broadcast. The videotape in question was not produced pursuant to the supplemental request. At the deposition of Irving Machleder, defendants' counsel represented to plaintiff's counsel that "all of the film that CBS had available of that incident, whether used or not used … were supplied to you."

The Joint Pretrial Order, so ordered by Judge Duffy on July 30, 1982, provided with regard to trial exhibits that the parties shall exchange documents which they reasonably anticipate to offer into evidence no later than 20 days prior to trial. On the morning of trial on May 9, 1985, after the jury had been selected and before opening statements were to begin, defendants' counsel notified plaintiffs' counsel that they intended to offer into evidence a videotape of the on-air report, complete with studio comments by Jim Jensen and Mr. Diaz. When plaintiffs' counsel objected and reserved the right to apply to the Court for sanctions at the end of trial, defendants' counsel explained in response that there was an "innocent explanation" for why the videotape had not been delivered earlier.[5]

---

5. On February 19, 1981, plaintiffs moved before Magistrate Joel J. Tyler for an order compelling

discovery in connection with defendants' failure to produce the original film footage and sound-

1377

In opposition to plaintiffs' motion for sanctions, defendants argue that the delay in production of the complete studio videotape did not prejudice plaintiffs because defendants produced an accurate transcript of the entire broadcast, including studio remarks, in response to plaintiff's initial discovery request. In addition, it is argued that defendants and their counsel acted in good faith at all times. The broadcast tape was not produced because it had been removed from the CBS Broadcast Center in late October, 1979 by someone in the employ of Coudert Brothers and inadvertently misplaced. Once the tape was recovered by Coudert Brothers on May 3, 1985, it was immediately delivered to plaintiffs' counsel. This good faith, coupled with plaintiffs' failure to demonstrate any prejudice is, they argue, fatal to plaintiffs' motion for sanctions. In addition, defendants did not violate the terms of the Pretrial Order since they could not have anticipated use of the tape if they did not realize the tape existed.

Defendants' explanation is unsatisfactory for two reasons. First, it is not at all clear to the Court that plaintiffs did not suffer prejudice as a result of defendants' belated delivery of the tape. The claims in this case arose out of a television broadcast. Essential to plaintiffs' claims was the reaction the broadcast of the report would provoke in a viewer. Without a videotape of the complete broadcast, it would have been difficult for plaintiffs to gauge the impact the broadcast would have on an audience of disinterested parties. This handicap must have affected plaintiffs' efforts in preparing for the trial of this case.

Second, on March 6, 1985, the videotape in question was submitted to the Court as an exhibit to defendants' *in limine* motion to be relieved from certain of Judge Duffy's prior rulings in the case. Exhibit B to that motion, described as "Outtakes and 5/22/79 Broadcast", is a videotape of the entire broadcast including studio comments and is identical to the videotape delivered to plaintiffs' counsel on or before May 9, 1985 and shown to the jury during opening statements by counsel. Defendants' claim that the videotape was first recovered on May 3, 1985 is refuted by their very own submission dated March 6, 1985. Defendants may claim that there is indeed a further "innocent explanation" for the evident confusion on their part, but whatever it may be leaves the Court with little choice in this instance.

As Magistrate Tyler observed in the context of a previous motion by plaintiffs' in connection with defendants' failure to deliver copies of film footage, defendants' conduct in this regard "demonstrate[s] to this court a marked lack of care ... and a cause of unnecessary effort and expenditure of time." Accordingly, plaintiffs' motion for sanctions pursuant to Fed.R.Civ.P. 16(f) and 37(b)(2)(D) is granted. Defendant CBS shall compensate plaintiffs for the reasonable costs and attorney's fees incurred in attempting to obtain a copy of the videotape after defendants' counsel first represented that it did not exist, including the costs of bringing this portion of the motion. Plaintiffs are directed to submit to the Court, within fifteen days of receipt of a copy of this decision, an accounting in sworn form, itemizing costs, hours worked by each attorney and the regular hourly fee charged for such work. Any objection as to the propriety of the amount of such expenses shall be made in writing to the Court within five days after receipt of such

track made on May 22, 1979. Plaintiffs' counsel had discovered that portions of the filmed outtakes had not been delivered by defendants. By Order dated April 22, 1981, Magistrate Tyler directed that defendants produce an exact and complete copy of the footage taken on May 22, 1979 to plaintiffs. Apparently, defendants had attributed their "continued failure" to adhere to Magistrate Tyler's prior orders to an "unfortunate series of mishaps" or a "circus of innocent

errors". Magistrate Tyler stated "[w]hat [defendants' conduct] does demonstrate to this court is a marked lack of care, a violation of prior commitments and a cause of unnecessary effort and expenditure of time by Machleder and this busy court." Magistrate Tyler advised defendants' counsel that unless the documents were delivered as directed, sanctions, including costs and attorney's fees would be imposed upon defendants or their attorneys.

accounting, with answering papers to be served within two days after receipt of such objection.

### The Diaz Affidavit

Plaintiffs' motion for sanctions under Fed.R.Civ.P. 11 and 56(g) is based upon the testimony of Mr. Diaz during trial with regard to an affidavit he signed and that defendants submitted in support of their summary judgment motion. On May 10, 1985, when the affidavit was first shown to Mr. Diaz on direct examination he did not recall having read it before. Mr. Diaz testified that he remembered signing it but stated it was not prepared by him. The basis for this testimony was that certain of the statements in the affidavit were incorrect. Mr. Diaz did not recall having had a conversation with his attorney before the affidavit was prepared. He claimed to have never received a copy of the affidavit before he signed it and did not know the purpose for which it would be used. Mr. Diaz admitted that he signed the affidavit although he disagreed with some of the facts it disclosed. In addition, he had never seen the diagram attached as Exhibit A to the affidavit nor the affidavit of Stephen Cohen, to which the Diaz Affidavit specifically referred. Based upon this testimony, plaintiffs contend that the Diaz Affidavit was that of his attorney, not his own.

On May 13, 1985, defendants' counsel produced to plaintiffs' counsel a draft affidavit signed by Mr. Diaz. Attached was a note purportedly from Mr. Diaz addressed to Ronald Guttman, Esq., CBS in-house counsel, stating "Ron, it looks good to me." Mr. Diaz testified that the draft affidavit refreshed his recollection that he had read the Diaz Affidavit. Mr. Diaz maintained that he had had problems with portions of the Diaz Affidavit and had told his attorneys of that fact. He testified, however, that he still disagreed with certain statements contained in the document.

Defendants' counsel opposed the sanctions motion on the grounds that they had prepared a final version of all the summary judgment affidavits in consultation with their clients. Meetings were held with Mr.

Diaz and several revised drafts were prepared in order to include the suggestions for changes made by Mr. Diaz. Exhibit A was based upon Mr. Diaz's descriptions of his movements in and around the Flexcraft plant.

I have closely read the portions of Mr. Diaz's testimony cited by plaintiff. Although the incident appeared unusual to me, the record indicates nothing more than that Mr. Diaz's memory of the affidavit and the process of its preparation had become vague with the passage of time. In addition, it appears to me that Mr. Diaz may have been unprepared for his testimony by not having his memory refreshed from the files and he was surprised when confronted by his affidavit. Plaintiffs' attempt to paint this situation as indicative of a deliberate attempt by defendants to mislead the Court and the jury is untenable. Accordingly, plaintiffs' motion for sanctions in connection with the Diaz Affidavit is denied.

### CONCLUSION

CBS's motions for judgment notwithstanding the verdict and for a new trial are denied. Plaintiffs' motion for sanctions is granted in part and denied in part.

SO ORDERED.